FIRST DIVISION

October 13, 1998

No. 1-96-2845

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

JOEL MAYORAL,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

Daniel Kelley,

Judge Presiding.

JUSTICE O'BRIEN delivered the opinion of the court:

Following a jury trial, defendant, Joel Mayoral, was found guilty of first-degree murder and sentenced to an extended term of 75 years in prison.  On appeal, he argues:  (1) the trial court erred by barring the testimony of a witness who would have provided evidence corroborating defendant's theory of self defense; (2) defendant's court-reported statement was obtained in violation of his fifth and sixth amendment constitutional rights; (3) the trial court erred by failing to hold a fitness hearing; (4) the State did not prove him guilty beyond a reasonable doubt; (5) the trial court abused its discretion in sentencing him; and (6) his trial counsel provided ineffective assistance.  We affirm.

At trial, Santiago Gutierrez testified that in May 1993, he, Jesus Rodriguez, Juan Guzman, and Omar Vaca lived together in a basement apartment at 2327 South Drake.  On the evening of May 7, 1993, Omar borrowed his father's car and drove his three roommates 

to a nightclub.  They left the club about 2:45 a.m.  Juan drove the car home, with Jesus in the front passenger seat, and Santiago and Omar in back.  

Juan dropped Jesus and Santiago off at home, and Santiago gave Juan some money to buy food.  Juan and Omar then drove toward a restaurant at 26th and Kedzie.  When Juan returned a few minutes later, he had blood on him and he told Santiago and Jesus that Omar had been shot.  Santiago went out to the car, where he saw Omar lying in the rear passenger seat.  The police arrived about five minutes later.

Detective Patrick Foley testified that on May 7, 1993, he received a radio call of a man shot at 2327 South Drake.  When he arrived at the scene, several police officers were already there and an ambulance was about to take Omar Vaca to the hospital, where he later died.  Detective Foley examined the vehicle and saw bullet holes in the trunk lid, the area between the trunk lid and the rear window, the speedometer, the armrest, and the front windshield.  He also recovered a 36-inch broomstick from the driver's side of the car.  

Detective Michael Gerhardstein testified that he and Detective Hoginson interviewed defendant at Area 4 police headquarters at approximately 7 p.m. on November 21, 1994.  They gave defendant his 
Miranda
 rights, and he agreed to talk with them.  Detective Gerhardstein told defendant that his name had come up in connection with the murder of Omar Vaca.  Defendant initially responded by denying any role in the shooting.  

Detective Gerhardstein then showed defendant some hand-written statements from persons implicating defendant in the shooting.  After reading the letters, defendant gave a court-reported statement in the presence of Detective Gerhardstein and Assistant State's Attorney Fahey.

In the statement, defendant said he was a member of the Latin Kings street gang.  At about 4 a.m. on May 7, 1993, Tom Perez, the head of the 25th Street Latin Kings, gave defendant a gun and told him to "play security" for their gang at 2505 South Trumbull; "play security" meant that defendant was to keep a look-out for members of rival gangs.  

A little while later, defendant saw a car pull up in front of the house at 2505 South Trumbull.  One of the Latin Kings yelled that the car contained members of the Disciples gang, which was a rival gang to the Latin Kings.  Defendant took the gun and went out front, where he saw several members of the Latin Kings run up to the car and throw bricks at it. 

Fellow gang member Francisco Franco pounded on the car and demanded that the people inside get out and identify themselves.  Defendant then saw the passenger in the back of the car pull out a "stick."  Next, he saw the car door open, and he heard Franco yell "he's reaching for something, he's reaching for something."  Franco ran for cover, and Tom Perez screamed out "shoot, shoot."  Defendant fired a shot, and then Tom Perez yelled to keep shooting, so defendant continued to shoot towards the car even as it sped off.

After the shooting, defendant ran to an alley and tried to throw his gun on the roof of a garage.  Then he ran back home and took a nap.  

Francisco Franco testified that in May 1993, he and defendant were members of the Latin Kings.  The 2500 block of Trumbull was Latin Kings territory.  At about 3:30 a.m. on May 7, 1993, Franco saw a car drive three times by 25th and Trumbull.  The first time the car drove by, the occupants of the car were both seated in front.  The second and third times the car drove by, one of the occupants sat in back.  

The third time the car went by, the driver flashed a hand signal of a gang allied with the Latin Kings.  However, the back seat passenger flashed a signal of an enemy gang.  The conflicting hand signals aroused Franco's suspicions that the occupants of the car might be enemies of the Latin Kings.  

The car eventually stopped on Trumbull.  Franco and some other Latin Kings approached the car, and Franco yelled at the passenger in the back seat to get out and identify himself.  The driver's side door opened, and Franco saw the back-seat occupant reach down and come up with an object that looked like a shotgun or a rifle.  Franco yelled out "he has a gun," then ran and hid between some cars.  

Franco heard three or four gunshots, looked up and saw that defendant was the shooter.  Franco and defendant then ran from the scene.

Defendant testified on his own behalf that in May 1993 he was a member of the Latin Kings.  At 3:30 a.m. on May 7, 1993, he was at 25th and Trumbull with Tom Perez, Francisco Franco, and other members of the Latin Kings, when he observed a car drive by.  Five minutes later, the car drove by again, and then it returned about five minutes after that.  Defendant saw the driver of the car give hand signals of a gang friendly with the Latin Kings, while the person in the back seat gave signs of a rival gang.  Defendant suspected that the occupants of the car were going to do a drive-by shooting, so he went to the back of the house at 2507 South Trumbull and retrieved a gun.  

When defendant returned from getting the gun, he saw the car stopped in the street.  Members of the Latin Kings were approaching the car, and Franco was standing near the driver's side of the vehicle.  Defendant approached the car on the passenger side.

Defendant saw the back-seat passenger (Vaca) open the door, and he heard Franco yell at Vaca "what are you reaching for[?]”  Defendant saw Vaca "come up with something long," which he "figured *** was a shotgun or rifle."  Someone yelled "he's got a gun."  Defendant then fired five or six shots at the car.  

After his arrest, defendant learned that a 36-inch broomstick was the only "long object" recovered from the car; no weapons were found.

The jury convicted defendant of first-degree murder, and the trial court sentenced him to an extended term of 75 years in prison.  Defendant filed this timely appeal.

First, defendant argues the trial court erred by barring

a witness, Ansellmo Gallardo, from testifying about a violent encounter he had with Juan and Omar a few minutes before the shooting occurred, in an alley a block away from 25th and Trumbull.  Defendant contends that the trial court should have admitted Gallardo's testimony to support his argument that Juan and Omar were the initial aggressors in the shooting.  In support, defendant cites 
People v. Lynch
, 104 Ill. 2d 194 (1984), which held that evidence of the victim's aggressive and violent tendencies is relevant and admissible to support defendant's assertion that the victim was the aggressor where there are conflicting accounts of what happened.  
Lynch
, 104 Ill. 2d at 200. 

Lynch
 is inapposite to the present case.  The record indicates that Gallardo would have testified to a violent encounter he had with 
Juan
 a few minutes before the shooting; however, there is no indication that Gallardo would have testified he ever saw 
Omar
, let alone had a violent altercation with him.  Thus, Gallardo's testimony was not admissible under 
Lynch
, since it would have shed no light on Omar’s (the victim's) allegedly aggressive behavior.

Defendant argues that evidence of a third party’s (Juan's) aggressive tendencies is admissible where, as here, the third party and the victim acted in concert during the confrontation with the defendant.  We disagree, as the cases defendant cites in support, 
People v. De Oca
, 238 Ill. App. 3d 362 (1992), 
People v. Robinson
, 163 Ill. App. 3d 754 (1987), and 
In re W.D.
, 194 Ill. App. 3d 686 (1990), are inapposite.  In 
De Oca
, the court determined that the victim and a third person instigated the initial confrontation with the defendant in which the victim was killed.  
De Oca
, 238 Ill. App. 3d at 367-68.  
De Oca
 did not involve the admission of evidence concerning the third party's prior aggressive behavior, and thus it has no bearing on the present case.

In 
Robinson
, the defendant allegedly committed an act of self-

defense against his attacker, during which a third person was killed.  The court held that evidence of the third person's prior threats and acts of violence against defendant were admissible to show defendant's state of mind while allegedly acting in self- defense.  
Robinson
, 163 Ill. App. 3d at 774.  

In 
W.D.
, the victim and a third person (John) were jointly acting as aggressors against defendant's relative (Robert), and defendant claimed that he stabbed the victim in defense of Robert. 
W.D.
, 194 Ill. App. 3d at 707.  The trial court precluded a police officer from testifying whether defendant stated that John was armed with a bottle or threatened Robert with a bottle immediately prior to and during the fight.  The trial court also precluded the officer from testifying whether the defendant had stated that John had a gun.  
W.D.
, 194 Ill. App. 3d at 707.  The appellate court found reversible error, holding that "[t]he testimony sought by defense counsel could hardly have been less remote or more relevant to the question of whether [defendant] was justifiably acting in defense of [Robert] at the instant he decided to use the knife."  
W.D.
, 194 Ill. App. 3d at 707.  

Like 
Robinson
, the testimony in 
W.D.
 concerned defendant's personal knowledge of a third-party's aggressive tendencies, and said testimony was admissible to show defendant's state of mind while allegedly acting in self-defense during an altercation in which the third party was present.  See 
W.D.
, 194 Ill. App. 3d at 707-08.  By contrast, in the present case, Gallardo would have testified to a violent altercation with Juan that occurred 
a block away from the shooting incident and that defendant never witnessed nor had any personal knowledge of.  Thus, unlike 
Robinson
 and 
W.D.
, Gallardo's testimony was about an event remote from the shooting and not material or relevant to the issue of whether defendant acted in self-defense at the time he shot Omar.  Accordingly, the trial court did not abuse its discretion by barring Gallardo's testimony.  

Defendant argues that the State "opened the door" to the admission of Gallardo's testimony by presenting evidence that Juan and Omar were "innocent passersby" who were merely driving to get some food when the Latin King gang members attacked them.  Defendant contends that the trial court should have admitted Gallardo's testimony to counter said evidence and show that Juan and Omar were in fact driving into Latin King territory looking for trouble.  In support, defendant cites 
People v. Melock
, 149 Ill. 2d 423, 465 (1992)("[f]undamental justice requires that the defendant have every opportunity to controvert the State's proof"), and 
People v. Wilbert
, 15 Ill. App. 3d 974, 984 (1973) (when a party opens the door to an issue by presenting evidence on that issue, "an opponent may reply with similar evidence if it is needed to eradicate an unfair prejudice which might ensue from the original evidence").

Here, though, the trial court admitted substantial evidence countering the State's evidence that Juan and Omar were "innocent passersby”; in particular, defendant and Francisco Franco testified that Omar and Juan drove by 25th and Trumbull three times and flashed contradictory gang signals, and that such behavior was indicative of rival gang members who were about to commit a drive-

by shooting. Given the admission of said evidence, Gallardo's testimony was not needed to "controvert the State's proof" of Juan and Omar's innocent behavior (
Melock
, 149 Ill. 2d at 465) or "eradicate an unfair prejudice [ensuing] from the original evidence." 
Wilbert
, 15 Ill. App. 3d at 484.  Rather, Gallardo's testimony, of a violent altercation he had with Juan at a different time and place from the shooting, would have been collateral to the material issue here, 
i.e.
, whether defendant committed murder when he shot Omar.  Therefore, the trial court did not abuse its discretion in barring Gallardo's testimony.  See 
People v. Batac
, 259 Ill. App. 3d 415, 426 (1994)(the trial court has the discretion to exclude evidence that is collateral to a material issue).  

Next, defendant argues the trial court erred when it denied his motion to suppress his court-reported statement on the grounds that the statement was not voluntarily given.  To determine the voluntariness of a statement, the court must look at the totality of the circumstances surrounding the making of the statement, including the existence of threats, promises, or physical coercion, the length and intensity of the interrogation, and the age, intelligence and physical condition of the defendant.  
People v. Hernandez
, 267 Ill. App. 3d 429, 432 (1994).  

Application of these factors shows that defendant voluntarily gave his statement.  At the time of his arrest, defendant was a 21-

year-old who had completed two years of college.  He had prior experience with the criminal justice system and had been questioned during prior arrests.  

Defendant argues his statement was involuntary because it was taken after police detained him for 17 hours.  We disagree.  Testimony at the hearing on the motion to suppress established that defendant was arrested around 11:30 a.m. on November 21, 1994, and transported to the tenth district police station, where he was booked.  Officers transported him to Area 4 police headquarters around 4 p.m, at which time Detective Gerhardstein was notified that defendant was in custody.  Before questioning defendant, Detective Gerhardstein read the reports on the case and talked with an assistant State's Attorney.  At around 7:30 p.m., Detective Gerhardstein had a 45-minute conversation with defendant, during which defendant gave an alibi for his whereabouts at the time of the shooting.  Detective Gerhardstein then left defendant at Area 4 police headquarters and talked with various persons in an attempt to verify the alibi.  Detective Gerhardstein next talked to defendant at around 1 a.m., at which time defendant made an oral admission of guilt.   That conversation lasted about 45 minutes.  The final conversation between Detective Gerhardstein and defendant occurred at 4 a.m, when a court reporter transcribed defendant's confession.

Thus, defendant's lengthy detention period was due in large part to Detective Gerhardstein's attempt to verify defendant's alibi, which defendant gave during his initial conversation with the detective.  Further, the duration of each interrogation session was reasonable; the first two sessions lasted only 45 minutes each, and the last one lasted only as long as it took defendant to give his court-reported statement.  Accordingly, we determine that the length of defendant's detention was not so unreasonable as to require suppression of his statement.  See also 
People v. House
, 141 Ill. 2d 323, 379-80 (1990) (statements taken after 25 and 37 hours of detention held admissible).  

Defendant argues that the repeated interrogations he was subjected to during his time in custody rendered his subsequent statement involuntary.  Specifically, defendant contends that, during those interrogations, police officers threatened and physically abused him.  Detective Gerhardstein denied that he or any other officer in his presence threatened or harmed defendant, and Assistant State's Attorney Fahey testified that defendant told her that the officers had treated him "fine."  The court found the testimony of Detective Gerhardstein and the assistant State's Attorney to be credible, and we will not substitute our judgment therefor. 
People v. Young
, 206 Ill. App. 3d 789, 800 (1990).

Defendant argues the officers tricked him into giving a statement by showing him the hand-written statements of his friends naming him as the shooter and by telling him that he should implicate his friends so he would not "go down" alone.  Defendant admitted he read the statements and that they truthfully stated he was the shooter.  Defendant points to no evidence that his friends' statements were fabricated or made up by the officers.  Accordingly, we reject defendant's argument that he was tricked into giving a statement.  

Defendant contends that, at the time of his statement, he was in poor physical condition as a result of an earlier fall from a roof.  Defendant argues that his physical condition rendered said statement involuntary.  We disagree.  The record indicates that defendant did not complain of injury or seek medical attention when he was questioned by Detective Gerhardstein, nor did the detective observe any injury that would render defendant incapable of giving a statement.  

Defendant also argues that the trial court should have suppressed his statement because it was elicited by the police in violation of his fifth and sixth amendment rights to counsel.  We disagree.  Under either amendment, the admonishment of 
Miranda
 rights generally suffices to render any subsequent waiver by defendant of his right to counsel valid as a matter of law.  
Patterson v. Illinois
, 487 U.S. 285, 296-97, 101 L. Ed. 2d 261, 275, 108 S. Ct. 2389, 2397 (1988); 
People v. Lane
, 256 Ill. App. 3d 38, 51 (1993).  The officers here testified that they gave defendant his 
Miranda
 warnings, and that he waived his  right to counsel.  The court found the officers' testimony credible, and as discussed above, we will not substitute our judgment therefor.  
Young
, 206 Ill. App. 3d at 800.

For all the foregoing reasons, the trial court's order denying defendant's motion to suppress was not manifestly erroneous, which is the standard of review we use when, as here, the motion turns on the weight and credibility of the evidence.  
People v. Carter
, 288 Ill. App. 3d 658, 662 (1997).

Next, defendant argues the trial court erred by failing to hold a fitness hearing.  Due process bars prosecution of a person who is not fit to stand trial.  
People v. Birdsall
, 172 Ill. 2d 464, 474-75 (1996).  Fitness to stand trial refers to defendant's ability to understand the nature and purpose of the proceedings and to assist in his defense.  
People v. Kinkead
, 168 Ill. 2d 394, 407 (1995).  Although a defendant is presumed fit to stand trial (725 ILCS 5/104-10 (West 1992)), the circuit court has a duty to order a fitness hearing whenever a 
bona
 
fide
 doubt exists as to the defendant's ability to understand the charges and participate in his defense.  
Kinkead
, 168 Ill. 2d at 407.

Defendant argues that prior to trial, he was stabbed in a prison riot.  As a result of the stabbing, defendant became paralyzed and is confined to a wheelchair.  Defendant contends that the seriousness of his disabling injuries, which were brought to the attention of the trial court prior to trial, raised a 
bona
 
fide
 doubt as to his fitness.

Fitness speaks only to defendant's ability to function within the context of the trial; it does not refer to competence in other areas.  
People v. Edmonds
, 143 Ill. 2d 501, 519-20 (1991).  The fact defendant was paralyzed and confined to a wheelchair is not sufficient, in and of itself, to establish a 
bona
 
fide
 doubt that he was unable to understand the nature of the proceedings against him or participate in his defense.   In fact, when apprising the court prior to trial about the nature of defendant's injuries, counsel made no claim that defendant's physical condition rendered him unfit.  Further, the record indicates that defendant participated in his defense and gave cogent testimony at trial.  See 
People v. Burgess
, 176 Ill. 2d 289, 304 (1997) (citing evidence of defendant's testimony and the trial court's observation of defendant in determining fitness).  Thus, the evidence here indicates that defendant's injury and resulting paralysis did not raise a 
bona
 
fide
 doubt as to his fitness.

Defendant's next argument, made for the first time on appeal, is that he was entitled to a fitness hearing because he ingested the psychotropic drug Elavil during his trial and sentencing.  Defendant relies on section 104-21(a) of the Illinois Code of Criminal Procedure of 1963 then in effect (725 ILCS 5/104-

21(a)(West 1994)), which provided that "[a] defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication."  725 ILCS 5/104-21(a)(West 1994).
(footnote: 1)
In a series of cases construing section 104-21(a) then in effect, our supreme court held that a defendant who is taking psychotropic drugs under medical direction at or near the time of trial is entitled to a fitness hearing.  See 
People v. Brandon
, 162 Ill. 2d 450 (1994); 
People v. Gevas
, 166 Ill. 2d 461 (1995); 
People v. Kinkead
, 168 Ill. 2d 394 (1995) (
Kinkead I
); 
People v. Birdsall
, 172 Ill. 2d 464 (1996); 
People v. Nitz
, 173 Ill. 2d. 151 (1996).  The court held that the failure to hold such a hearing necessitated reversal of defendant's conviction and remandment for further proceedings.  
Brandon
, 162 Ill. 2d 450; 
Gevas
, 166 Ill. 2d 461; 
Birdsall
, 172 Ill. 2d 464; 
Nitz
, 173 Ill. 2d 151.  In one case where the record indicated defendant had been taking psychotropic medication, but the details of his treatment could not be ascertained from the record, the supreme court remanded to the circuit court for the limited purpose of clarifying the schedule of treatment and determining whether factual grounds for a fitness hearing existed at the time of defendant's trial and sentencing.  
Kinkead I
, 168 Ill. 2d at 417.

In 
People v. Burgess
, 176 Ill. 2d 289 (1997), 
People v. Neal
, 179 Ill. 2d 541 (1997), 
People v. Cortes
, 181 Ill. 2d 249 (1998), and 
People v. Kinkead
, 182 Ill. 2d 316 (1998) (
Kinkead II
), the supreme court modified the automatic reversal rule of 
Brandon
 and its progeny.  
Burgess
, 
Neal
, 
Cortes
 and 
Kinkead II
 held that a defendant denied his right to a fitness hearing is not automatically entitled to a new trial if evidence presented to the court in a posttrial proceeding establishes that defendant did not suffer impairment as a result of his ingestion of psychotropic medication.  

Defendant argues that since no such posttrial proceeding occurred here, we should either reverse his conviction and remand for a new trial pursuant to 
Brandon
 and its progeny, or remand for a 
Kinkead I
 hearing to determine whether factual grounds for a fitness hearing existed at the time of trial or sentencing.  

Defendant's argument fails because, unlike in 
Brandon
 or 
Kinkead I
, there is no indication anywhere in the record supporting defendant's assertion that he used the psychotropic drug Elavil.  
People v. Kidd
, 175 Ill. 2d 1 (1996), is instructive.  In 
Kidd
, defendant argued that he used Elavil, and therefore he was entitled to a fitness hearing.  The supreme court rejected defendant's argument, noting that there was no evidence in the record that he was taking the psychotropic drug at any point near the time of trial or sentencing. Rather, his references to psychotropic treatment predated by substantial periods the beginning of defendant's trial.  
Kidd
, 175 Ill. 2d at 20.  The court refused to remand the case for development of a further evidentiary record concerning the medication because to do so "would mean that a remand must be available in every case in which the record contains some reference to the defendant's long-ago treatment with a psychotropic drug."  
Kidd
, 175 Ill. 2d at 20.  Here, there is no evidence or indication in the record that defendant took Elavil 
at
 
any
 
time
, and thus defendant has even less cause than 
Kidd
 to argue for reversal or remandment.  Further, since no evidence supports defendant's assertion that he took Elavil, said assertion is outside the record and must be disregarded.  See 
Service Adhesive Co. v. Industrial Comm’n
, 226 Ill. App. 3d 356, 366 (1992).  

Defendant also argues for a section 104-21(a) fitness hearing based on his taking two prescription drugs, Ibuprofen and Baclofen, seven months before trial.  However, our supreme court has held that section 104-21(a) then in effect, which provides for a fitness hearing for defendants "receiving psychotropic drugs or other medications under medical direction," applies only when defendant takes psychotropic drugs.  725 ILCS 5/104-21(a)(West 1994).  Thus, treatment with nonpsychotropic drugs is not sufficient to trigger the statute.  
People v. Britz
, 174 Ill. 2d 163, 196-97 (1996); 
Kidd
, 175 Ill. 2d at 18.  Neither Ibuprofen or Baclofen is a  psychotropic drug
(footnote: 2); rather, Ibuprofen is an anti-inflammatory agent, and Baclofen is a muscle relaxant and antispastic.  See Physician's Desk Reference 1389, 1634 (51st ed. 1997).  Thus, neither drug is the type that affects one's ability to understand the charges against him or assist in his defense; accordingly, defendant's ingestion of those drugs does not raise a 
bona
 
fide
 doubt of fitness. 

Further, the time lapse between defendant's ingestion of the drugs and the time of trial provides yet another reason for rejecting his argument that he was entitled to a fitness hearing.

See 
Kidd
, 175 Ill. 2d at 20.

Next, defendant argues the State failed to prove him guilty beyond a reasonable doubt because he acted in self-defense.  On review, this court will not reverse a criminal conviction unless the evidence is so improbable that a reasonable doubt of defendant's guilt is justified.  
People v. Moore
, 171 Ill. 2d 74, 94 (1996). The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Collins
, 106 Ill. 2d 237, 261 (1985).   

A defendant who raises self-defense must establish some evidence of each of the following elements:  (1) force is threatened against defendant; (2) 
defendant is not the aggressor
; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) defendant actually and subjectively believed a danger existed that required the use of the force applied; and (6) defendant's beliefs were objectively reasonable.  (Emphasis added.)  
People v. Jeffries
, 164 Ill. 2d 104, 128 (1995).  Defendant's claim fails if the State negates any one of the self-defense elements.  
Jeffries
, 164 Ill. 2d at 128.

Viewing the evidence in the light most favorable to the prosecution, the jury could have concluded that defendant was the aggressor here for arming himself with a gun, following his fellow Latin King members as they converged on the car, and firing at the car even as it sped away.  Thus, the evidence was not so improbable, impossible or unsatisfactory as to raise a reasonable doubt of guilt. 

Defendant also argues that he satisfied his burden under section 9-2(a)(2) of the Criminal Code of 1961 (720 ILCS 5/9-

2(a)(2)(West 1996)), which reduces a first-degree murder conviction to second-degree if defendant proves by a preponderance of the evidence that at the time of the killing he had an unreasonable belief in self-defense.  We disagree.  Since there was evidence from which the jury could conclude that defendant was the aggressor, this form of second-degree murder is unavailable to him.  
People v. Tenner
, 157 Ill. 2d 341, 373 (1993); 
People v. Sloan
, 111 Ill. 2d 517, 521 (1986).

Next, defendant argues the trial court abused its discretion when it sentenced him to an extended term of 75 years in prison.  Defendant contends the trial court failed to give adequate consideration to his rehabilitative potential.

Defendant waived this issue by failing to file a postsentencing motion.  
People v. Reed
, 177 Ill. 2d 389 (1997).  Even choosing to address the issue on the merits, we find no error.

The trial court expressly stated that it had examined the presentence report and the statutory factors in mitigation, and thus we may presume that the court took into account defendant's potential for rehabilitation.  
People v. McCain
, 248 Ill. App. 3d 844, 853 (1993); 
People v. Grisset
, 288 Ill. App. 3d 620, 635 (1997). Defendant's argument to the contrary is that the court never commented on the issue of rehabilitative potential.  However, the court is not obligated to recite and assign value to each factor it relies upon, nor does it need to place greater weight on defendant's rehabilitative potential than on the seriousness of the offense or the need to protect the public.  
McCain
, 248 Ill. App. 3d at 854.  The trial court here found that the statutory aggravating factors "far outweigh[ed]" any mitigating factors, specifically noting that defendant's conduct caused serious harm (730 ILCS 5/5-5-3.2(a)(1)(West 1996)), that defendant had a history of criminal activity (730 ILCS 5/5-5-3.2(a)(3)(West 1996)), specifically, a prior conviction for attempted murder, and that the sentence was necessary to deter others from committing the same crime (730 ILCS 5/5-5-3.2(a)(7) (West 1996)).  The court correctly noted that defendant was eligible for an extended 75-year sentence because his conviction for first-degree murder occurred within 10 years after a previous conviction for attempted first-degree murder.  730 ILCS 5/5-5-3.2(b)(7)(West 1996).  We find no abuse of discretion.  

Finally, defendant argues his trial counsel provided ineffective assistance.  To establish a claim of ineffective assistance, defendant must show that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced defendant.  
People v. Albanese
, 104 Ill. 2d 504, 525 (1984). 

Defendant contends his counsel was ineffective for failing to move for a fitness hearing.  We reject this argument.  As discussed above, no evidence existed that indicated a 
bona
 
fide
 doubt as to defendant's fitness. 

Defendant contends his counsel was ineffective for failing to object to the State's motion to exclude explanation of how defendant was injured, and for failing to seek a jury instruction explaining the reason defendant was confined to a wheelchair.  We find no ineffective assistance, as counsel correctly determined that the nature and reason for defendant's injuries were not related to the murder charge and, thus, were not a proper consideration for the jury.  

Defendant also contends his counsel was ineffective for failing to offer certain evidence in mitigation regarding his relationship with his mother and girlfriend.  We find no ineffective assistance.  The mitigation evidence was included in the presentence report.  Trial counsel cannot be faulted for failing to introduce mitigating evidence that was already included in that report.  
People v. Hampton
, 149 Ill. 2d 71, 110 (1992).

Defendant contends his counsel was ineffective for failing to file a postsentencing motion.  We disagree, as no prejudice resulted from counsel's failure to file the motion.

For the foregoing reasons, we affirm the trial court.  As part of our judgment, we assess defendant $150 as costs for this appeal.

Affirmed.

TULLY and GALLAGHER, J.J., concur.

FOOTNOTES
1:     
Following defendant's trial and sentencing, the legislature amended the statute to provide: "[a] defendant who is receiving psychotropic drugs shall not be presumed to be unfit to stand trial solely by virtue of the receipt of those drugs or medications."  725 ILCS 5/104-21(a) (West 1996).  The amended statute does not apply retroactively here.  See 
People v. Kinkead
, 182 Ill. 2d 316 (1998).

2:     
Britz
, 174 Ill. 2d at 198,  and 
Kidd
, 175 Ill. 2d at 18, adopted the definition of psychotropic medication found in section 1-121.1 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-121.1 (West 1996)).  Under that definition, psychotropic medication is "medication whose use for antipsychotic, antidepressant, antimanic, antianxiety, behavioral modification or behavioral management purposes is listed in AMA Drug Evaluations, latest edition, or Physician's Desk Reference, latest edition, or which are administered for any of these purposes."