THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DONALD KALWA, Defendant-Appellant.

First District (6th Division)   No. 1—97—1671

Opinion filed June 30, 1999.—Rehearing denied August 19, 1999.

Michael J. Pelletier and James E. Chadd, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Jon J. Walters, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Following a jury trial, defendant Donald Kalwa was convicted of first degree murder and armed robbery and was sentenced to concurrent prison terms of 100 years and 30 years, respectively. Defendant had two trials. On July 18, 1995, following a bench trial, defendant was convicted of first degree murder and armed robbery. However, defendant was granted a new trial because, after defendant waived a jury but before trial, defense counsel discovered that a fingerprint previously thought to be unsuitable for comparison was comparable and did not match defendant's fingerprints. Defendant's second trial began on May 20, 1996, and after a retrial with a jury, defendant was again convicted of first degree murder and armed robbery. Defendant appeals, contending that: (1) he should be granted a new trial because he was taking psychotropic medication during the trial but never received a fitness hearing; (2) the State failed to prove beyond a reasonable doubt that the offense of armed robbery occurred in Cook County, as charged in the indictment; and (3) the trial court erred in instructing the jury that it could find defendant guilty of armed robbery if the offense occurred in either Du Page or Cook County. For the reasons that follow, we affirm defendant's convictions.

The following pertinent facts were adduced at defendant's jury trial. During the summer of 1993, the victim, Rachel Rachlin, responded to an advertisement defendant placed in the newspaper seeking a female roommate. Defendant lived in a one-bedroom apartment in Westmont, Illinois, which is in Du Page County. Rachel moved into defendant's apartment in the middle of July.

On August 17, 1993, approximately one month after moving in with defendant, Rachel told her best friend, Mary Ann Dzibula, that she was unhappy with the living arrangement and wanted to move out. That same day, Vince Adamus, Rachel's ex-boyfriend, had dinner with her and he testified that was the last time he saw her alive.

On September 1, 1993, Rachel's vehicle was found in a remote parking lot at O'Hare Airport. Rachel's body was found in the trunk of the car buried under a pile of dirt. Rachel's death was apparently caused by three gunshot wounds to the head. Her head was wrapped in a large white plastic bag. The vehicle was photographed and dusted

for fingerprints. A note and a Britannia men's watch, with hair wrapped around the winding stem and band and bloodstains on its face, were recovered from the vehicle.

Randy Caruso testified that on August 20, 1993, he owned and operated a limousine service and received a dispatch just before 2 p.m. that he was to pick up a passenger named John Noble at O'Hare Airport and take him to Westmont. Caruso testified that when he arrived at Terminal One and called for John Noble, defendant approached and said he was "Don" and was going to Westmont. Defendant told Caruso that he was not from Westmont but was in town visiting friends. Caruso dropped defendant off in Westmont. On September 3, 1993, Caruso spoke with police officers and on September 14, 1993, identified defendant in a lineup.

Kuriakose Matthew, assistant director of aviation parking facilities at O'Hare Airport, testified that, according to records, Rachel's car first appeared in a remote parking lot on August 20, 1993. The "people mover" transported persons from that parking lot to Terminal One.

Vince Adamus testified that on August 20, 1993, he received a message from a woman who said that, while walking, she found a check with his telephone number on it. Adamus and Rachel had accounts at the Evanston Bank and Rachel's checks had his address and telephone number printed on them. This check was made out to defendant in the amount of $400.

Patricia Egerdahl testified that on the morning of August 21, 1993, she was walking down Fairview Avenue around 59th Street in Downers Grove. She saw a check in the street and picked it up. She called the telephone number on the check and left a message. She turned the check over to the police.

The victim's mother, Roslyn, testified that she went to her daughter's apartment on August 24, 1993, with Westmont police and spoke to defendant. Defendant told Roslyn that Rachel had moved out and taken all of her belongings with her. Defendant also told Roslyn that he had seen Rachel's car in the apartment complex late on the night of August 20. The police recovered numerous items belonging to Rachel in defendant's apartment, including a jewelry box, a filing cabinet containing the victim's correspondence, a lamp and a telephone.

John Theis, the maintenance man for the apartment complex, testified that on August 20, 1993, between 8 and 9 a.m., he saw defendant carrying furniture and other items to the garbage area near his apartment complex. Theis recovered a mattress, a television, a watch and a pearl ring with diamonds. Late on August 21, 1993, Theis saw defendant put black plastic bags into the garbage at the apartment complex. From these bags, Theis recovered a word processor, a color television and a telephone.

Norma Fazio, an officer for St. Paul Federal Bank, testified that on August 20, 1993, at the Downers Grover branch, defendant signed the back of a check from the victim's account made out to defendant for $600, deposited $450 into his account, and received $150 in cash. Defendant cashed two checks belonging to the victim; one which was made out to cash for $150 and another one made out for $200 on August 22, 1993. Fazio also identified a check from the victim made out to defendant for $390 dated August 21, 1993.

Dorothy Myer, vice president of Evanston Bank, testified that Rachel's account had a balance of $1056.06 on August 19, 1993, and a balance of $54.83 on September 3, 1993. Rachel's last automated teller transaction was on August 19, 1993. One check from the victim's account was dated August 20, 1993, and was made out to Commonwealth Edison in payment of defendant's electric bill. Other checks from the victim's account paid defendant's phone bill and a newspaper bill. On August 24, 1993, a stop payment order was received by telephone, stopping payment on the victim's check made out to a mattress store. Defendant's telephone number was listed on the order as a reference number.

Jeanne Brundage, a handwriting and printing examiner for the Illinois State Police Crime Lab, testified that she compared various items with known handwriting samples of Rachel and defendant. In Brundage's opinion, Rachel's check found in Downers Grove and made out to defendant for $400 had a simulation of Rachel's handwriting for her endorsement, and defendant's actual signature as a second endorsement. The check made out to defendant for $600 dated August 20, 1993, had a simulation of Rachel's signature, defendant's genuine signature and pictorial similarities to Rachel's known writing as to the other entries. The other checks testified to by Myer also contained simulations of Rachel's signature.

Jim Jilek, the keeper of records for Ameritech, testified that the last call on Rachel's telephone line on August 19, 1993, was at 10:06 p.m. The first call on that line on August 20, 1993, was made to directory assistance at 8:15 a.m., followed by several calls to the Evanston Bank. No calls were made on August 21 or 22. On August 23, 1993, calls were placed to information at 4:34 and 4:38 p.m. and to the Evanston bank at 4:35 p.m. The last call on August 23, 1993, was at 4:38 p.m.

Westmont police sergeant Robert Smith testified that he executed a search warrant on defendant's apartment on September 2, 1993. In addition to the property mentioned previously, a white plastic bag similar to the one wrapped around the victim's head was found. Smith testified that he asked defendant to cooperate in the investigation and

defendant replied, asking why he should cooperate as he would only "fry by himself." Defendant then asked Smith if his Star Wars posters would fit in an 8-foot by 12-foot prison cell. Defendant denied being at O'Hare Airport recently.

Chicago police detective Richard Schak testified that on September 2, 1993, he interviewed defendant. Defendant told Schak that the mattress recovered from the garbage was his. Defendant denied ever signing the $400 check recovered on the street. Defendant also denied that Kathy Southcott ever gave him a Britannia watch. Defendant said that the victim's property was all gone when he came home one day. After Schak asked defendant why the victim was killed, defendant became teary-eyed and said that it was not anything like an argument or sex, but he could not tell Schak what it was about. Schak also asked defendant why defendant would put her in dirt, and defendant said it was to hide or mask the odor. Defendant was allowed to go home after this interview.

Schak testified that he then spoke to Randy Caruso, who identified defendant's picture from a photo array. Schak next talked to handwriting expert Jeanne Brundage. After this, on September 9, 1993, Schak secured an arrest warrant for defendant. Schak testified that after he arrested defendant, defendant asked why so many police came to arrest him. Defendant said the police were acting as if he were Jeffrey Dahmer and that this was the killing of only one girl and was not that big of a deal.

Mark Goldman testified that in July 1993 he sold the victim the mattress recovered from the garbage.

Kathy Southcott testified that she dated defendant from 1989 to 1994 and that she gave defendant a Britannia watch for Christmas, 1992. She identified the Britannia watch found in the victim's car as being similar to the one she gave defendant.

Bernadette Kwak of the Chicago Police Crime Lab, supervisor of the microscopy trace section, compared hair removed from the victim to the hair on the Britannia watch and found it to be similar.

In the defense case, Janet Gwinn, a resident of the apartment complex, testified that she saw Rachel removing empty boxes from her car on August 19, 1993, and in response to Gwinn's question, Rachel said she was moving out. Gwinn also testified that she saw Rachel arguing with a man in the parking lot of the apartment complex on August 20, 1993, at about 4 a.m. Gwinn described the man as dark haired and approximately 6 feet tall. The man was holding Rachel's wrist and Rachel told him to get his "hands off of her." The man was pulling Rachel and it appeared that she did not want to go with him. Gwinn testified that this man was not defendant.

In rebuttal, Sergeant Smith testified that when he interviewed Gwinn shortly after defendant's arrest, Gwinn said she was not certain if it was the victim and the defendant she had seen in the parking lot on August 20, 1993. At the close of evidence, defense counsel requested a venue instruction. The court gave an instruction requiring venue to be proved in either Cook or Du Page County. After closing arguments, defendant was convicted of first degree murder and armed robbery.

Before sentencing, the trial court learned defendant was on psychotropic medication during trial. The court, on its own motion, ordered a psychiatric examination to determine defendant's fitness for sentencing. On August 29, 1996, Dr. Matthew Markos found defendant mentally fit for sentencing purposes. Dr. Markos' report stated that defendant was receiving 150 milligrams of Sinequan at night for insomnia at the time, there was no indication that defendant was experiencing any side effects or that any effects would interfere with his competency for sentencing, defendant was cognizant of the charges pending against him, and defendant had the capacity to cooperate with counsel. The trial court granted a continuance to allow additional examination of defendant as to any effects defendant's medication might have had on him during the course of the trial.

On October 18, 1996, the trial court ordered that defendant be examined for fitness at the time of trial without objection from a substitute defense counsel. On October 25, 1996, Dr. Markos submitted a report which stated that, pursuant to the court's order, Dr. Markos attempted a clinical examination of defendant, but defendant told Dr. Markos that he was advised by defense counsel not to participate until his case had been discussed further in court. Over defense counsel's objection, the court reordered the examination on November 4, 1996, stating that it was better to determine fitness now rather than later. The court told both sides that once the Psychiatric Institute issued a report, the court would provide for any further psychiatric examinations they wished. On November 20, 1996, defendant filed a supplementary motion for new trial based on his consumption of psychotropic drugs during trial.

Dr. Markos filed a report on December 6, 1996, indicating that he made another attempt to examine defendant, but defendant again refused to be interviewed stating that defense counsel advised him not to cooperate with the court-ordered examination.

During the court proceeding on December 6, 1996, the court pointed out to defendant and defense counsel that the burden was on defendant to show that he was unfit. The court said that there was no indication by defense counsel that defendant had been unable to cooperate with counsel or was not able to understand the nature of the

proceedings. The court further said that while it could not force defendant to cooperate with a fitness examination, without such cooperation, the psychiatrist could not make the examination and holding a fitness hearing would be futile. Defense counsel Scott Arthur said that the only appropriate evidentiary hearing would have to be confined to whether defendant had taken psychotropic drugs during trial.

On January 10, 1997, the court told counsel that it was going to order a fitness hearing to determine whether defendant was fit. Mr. Arthur inquired, "[h]ow do you propose to do that, judge?" The court replied that it would ask the State to call the doctor who administered the drugs defendant allegedly was taking at the time of trial. The court continued that it was the court's duty to order such a hearing. The State then asked for a copy of defendant's psychiatric records which the court had earlier turned over to defendant. Mr. Arthur said that the only records the State was entitled to were those attached to his November 20, 1996, motion for new trial. The court ordered defendant to turn over the records for an *in camera* inspection.

On March 5, 1997, the trial court told counsel and defendant that it had "no question" about the ability of defendant to understand the nature of the proceedings and to cooperate with counsel. The court continued, "[i]f defense counsel wishes to request a fitness hearing at this time, or if the defendant wishes to file an additional memorandum or motions regarding what I intend to do, I will be glad to give you the time to file those." The court then inquired of Mr. Arthur whether he wished to stand on the court's rulings and proceed with the balance of the case. The court also asked defense counsel if he wished to confer with his client. Mr. Arthur replied that he had spoken to his client and that his client had earlier indicated his desire to "get this thing moving as soon as possible." Mr. Arthur then asked that the case be continued until March 20, 1997, so he could "digest" the court's ruling. The court then reminded defendant and Mr. Arthur that Dr. Markos' August 27, 1996, report had found defendant fit.

On March 20, 1997, the court reviewed the history of the case since the August 27, 1996, fitness exam had taken place. The court pointed to defendant's refusal to cooperate with the Psychiatric Institute in obtaining fitness exams on two occasions. The court then cited the amended version of section 104—21(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—21 (West 1996)) and then said, "I am left with proceeding to sentencing, unless you have any other motions you wish to make." Mr. Arthur then made an offer of proof that the medical records he had attached to his November 29, 1996, motion for new trial indicated that throughout 1996 defendant was on Doxepin and Sinequan. It should be noted that Doxepin and

Sinequan are different names for the same drug. Further, the medical records attached to the motion indicate that, at the time of trial, defendant was only taking Sinequan. Mr. Arthur again asserted that any evidentiary hearing would have to be limited solely to whether defendant was taking psychotropic drugs at the time of trial. The court replied that under *People v. Nitz*, 173 Ill. 2d 151, 670 N.E.2d 672 (1996), "[t]his defendant is entitled to a fitness hearing. I stand ready today, and willing to have a fitness hearing at this time." The court continued, "[t]he court ordered [a fitness examination], the defendant saw fit not to cooperate with such an examination. Even today, as we sit here now, there is no request by the defense, nor is there any indication that the defendant is unfit, or that defendant wishes a fitness hearing at this time." Defense counsel then asked to consult with defendant as to whether he was willing to be examined. After a recess, defense counsel asked for a continuance so defendant could consider what he wished to do, understanding that by not seeking a fitness hearing, the defense could be waiving that as an issue. The court granted the continuance stating, "I have no question, by any conduct of the defendant or of defense counsel's comments about his conduct and willing [*sic*] to relate with you, both as to his understanding of the proceedings and the [*sic*] to cooperate with you. I have no basis to order a fitness hearing. If you are requesting it, I will be glad to so order."

On April 11, 1997, Mr. Arthur informed the court that the defense was not asking for a fitness hearing: "[W]e're simply requesting a new trial ***. If at a minimum you want to conduct an evidentiary hearing just to verify the documents and the materials that I filed with the court, that's fine; we can do that." The court repeated that if defendant wanted a fitness hearing, it would be granted. The court cited the amended version of section 104—21(a) as being applicable as the case was still pending. The court again pointed out that "[n]o one even to this date has made any suggestion that the defendant is unfit for trial. Defense counsel has worked with him throughout the course of these two trials, as well as even prior to his arrest, has never made any indication to this Court or any indication that the defendant is unfit, and that he cannot cooperate with counsel or cannot understand the value of the proceedings. There were two trials already. I think it's time to move on."

The trial court then denied defendant's motion for new trial based on defendant's use of psychotropic medication. On April 18, 1997, defendant was sentenced to an extended term of 100 years' imprisonment for first degree murder and a concurrent term of 30 years' imprisonment for armed robbery.

Defendant first contends that he should be granted a new trial or, in the alternative, a retrospective fitness hearing because he was taking psychotropic drugs at the time of trial. On appeal, both parties initially focus on which version of section 104—21(a) of the Illinois Code of Criminal Procedure of 1963 (Code) applies. Until December 1995, section 104—21(a) provided:

"A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." 725 ILCS 5/104—21(a) (West 1994).

The legislature amended this section effective December 31, 1995, to provide:

"A defendant who is receiving psychotropic drugs under medical direction is entitled to a hearing on the issue of his or her fitness while under medication; however, no hearing is required unless the court finds there is a bona fide doubt of the defendant's fitness." 725 ILCS 5/104—21(a) (West Supp. 1995).

While this version of the statute was applicable at the time of the jury trial here, it was declared unconstitutional by our supreme court. *Johnson v. Edgar*, 176 Ill. 2d 499, 517-18, 680 N.E.2d 1372, 1380 (1997).

■ The statute was then amended effective December 31, 1996, to provide:

"A defendant who is receiving psychotropic drugs shall not be presumed to be unfit to stand trial solely by virtue of the receipt of those drugs or medications." 725 ILCS 5/104—21(a) (West 1996).

Our supreme court has recently made clear that amended section 104—21(a) may not be given retroactive effect. *People v. Kinkead*, 182 Ill. 2d 316, 335, 695 N.E.2d 1255 (1998) (*Kinkead II*). The version of the statute that applies is that which was in effect on the date defendant's right to a fitness hearing vested. *People v. Hill*, 297 Ill. App. 3d 500, 513, 697 N.E.2d 316 (1998), citing *People v. Cortes*, 181 Ill. 2d 249, 692 N.E.2d 1129 (1998). At the latest, a defendant's right to a fitness hearing vests at the time of sentencing. *People v. Carlson*, 293 Ill. App. 3d 984, 988, 691 N.E.2d 1156 (1997). In this case, defendant's trial concluded in June 1996 but he was not sentenced until April 1997. Accordingly, under *Carlson*, the amended version of section 104—21(a) applies. However, we need not address the effect of this amendment. Even if we were to assume that the original version of the statute applies, the trial court complied with its requirements. See *People v. Burton*, 184 Ill. 2d 1, 13-14, 703 N.E.2d 49 (1998).

The trial court here did not investigate the issue of defendant's competence to stand trial until the presentence report revealed that

defendant was prescribed Sinequan, a psychotropic drug, during the course of the criminal proceedings. Under the 1994 pre-amended version of section 104—21(a), this entitled defendant to a fitness hearing. *Cortes*, 181 Ill. 2d at 275.

■ Section 104—11(a) of the Code provides:

"The issue of the defendant's fitness for trial, to plead, or to be sentenced may be raised by the defense, the State or the Court at any appropriate time before a plea is entered or before, during, or after trial." 725 ILCS 5/104—11(a) (West 1994).

The court in *Kinkead II* held that a case-by-case approach based on each case's specific facts must be taken in determining a defendant's fitness to stand trial and a defendant will not receive a new trial solely because he was receiving psychotropic medications during trial and sentencing. *Kinkead II*, 182 Ill. 2d at 340.

In *People v. Burgess*, 176 Ill. 2d 289, 680 N.E.2d 357 (1997), *People v. Neal*, 179 Ill. 2d 541, 689 N.E.2d 1040 (1997), *People v. Cortes*, 181 Ill. 2d 249, 692 N.E.2d 1129 (1998), and *People v. Kinkead*, 182 Ill. 2d 316, 695 N.E.2d 1255 (1998) (*Kinkead II*), our supreme court held that a defendant denied his right to a fitness hearing is not automatically entitled to a new trial if evidence presented to the court in a posttrial proceeding establishes that defendant did not suffer impairment as a result of his ingestion of psychotropic medication. *People v. Mayoral*, 299 Ill. App. 3d 899, 910-11, 702 N.E.2d 238 (1998). The rule announced in these cases applies to cases pending at the time they were announced, including cases pending on direct review, such as the instant case. *Hill*, 298 Ill. App. 3d at 514, citing *Cortes*, 181 Ill. 2d at 276.

Defendant argues that since no posttrial fitness hearing was conducted here, we should either reverse his convictions and remand for a new trial pursuant to *People v. Brandon*, 162 Ill. 2d 450, 643 N.E.2d 712 (1994), and its progeny, or remand for a hearing to determine whether defendant was competent to stand trial at the time of trial.

■ A trial court's determination regarding fitness will not be disturbed on review unless it is against the manifest weight of the evidence. *People v. Haynes*, 174 Ill. 2d 204, 226, 673 N.E.2d 318 (1996). Absent facts that raise a *bona fide* doubt of fitness, there is an abiding presumption that a defendant is fit to stand trial. *People v. Eddmonds*, 143 Ill. 2d 501, 512, 528 N.E.2d 952 (1991).

In *Kinkead I* and *Kinkead II*, our supreme court held that a trial counsel's failure to request a fitness hearing under section 104—21(a) did not waive the issue and that because the trial court had notice from the presentence report that defendant was receiving psycho-

tropic medication (as here), "the court had a duty to further investigate defendant's fitness for trial." *Kinkead II*, 182 Ill. 2d at 337, citing *People v. Kinkead*, 168 Ill. 2d 394, 406-07, 660 N.E.2d 852 (1995) (*Kinkead I*).

■ The record of the numerous court proceedings from the time the court learned from the presentence report that defendant had taken Sinequan during the trial, to the date of sentencing 10 months later, is overwhelmingly clear that the trial court did everything that it possibly could to "further investigate defendant's fitness for trial." The trial court ordered a fitness exam on July 23, 1996, which was performed and defendant was found fit. At the time of this fitness hearing, defendant was taking 150 milligrams of Sinequan. At the time of trial, defendant was taking 175 milligrams of Sinequan. Because the psychiatric report only dealt with whether defendant was fit for sentencing, the trial court ordered that a second fitness examination be made to determine defendant's fitness to stand trial retroactively to June. This order was entered four months after the trial and was not objected to by defendant or by substitute defense counsel who worked with the trial attorney. After defendant refused to be examined, the trial court advised defendant and defense counsel that it was ordering another fitness exam and subsequently reminded defendant and defense counsel that it was his burden to show that he was unfit. During these numerous and protracted posttrial proceedings, the trial court repeatedly told defendant and defense counsel that there was no indication observed by the court or brought to the court's attention by any party that defendant was ever unable to cooperate with defense counsel or that defendant was unable to comprehend the nature of the proceedings.

The trial court repeatedly advised defendant and defense counsel that it would order a fitness hearing if they requested one. In reply, defense counsel asserted that the only issue properly before the court was whether defendant was on psychotropic medication at the time of trial and therefore defendant was unwilling to cooperate with a fitness examination. The court advised defendant and defense counsel several times that without a fitness examination, and without a request by defendant for a fitness hearing, the court would have to deny defendant's separate motion for a new trial based on his taking psychotropic drugs. Defense counsel twice continued the case so that he could discuss this issue and the issue of waiver with his client. After these continuances, defense counsel asserted that it was his client's wish to stand on the court's rulings and not request a fitness hearing. It was only after defendant refused the court's repeated offerings to conduct a fitness hearing that the court denied defendant's motion for a new trial based on his taking Sinequan during the trial.

In *People v. Nitz*, 173 Ill. 2d 151, 155-56, 670 N.E.2d 672 (1996), our supreme court held, "[a]s Justice Kennedy recently emphasized, 'competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.' *Riggins v. Nevada*, 504 U.S. 127, 139-40, 118 L. Ed. 2d 479, 492, 112 S. Ct. 1810, 1817 (1992)."

The trial court made these same comparisons when it advised defendant and defense counsel that the original language of section 104—21(a) entitled defendant to a fitness hearing but did not require one to be held if defendant refused to ask for one. In doing so, the trial court cited the definition of "entitled." Black's Law Dictionary defines "entitled" as "to give a right or legal title to. [Citation.] To qualify for; to furnish with proper grounds for seeking or claiming." Black's Law Dictionary 532 (6th ed. 1990).

It is well settled in Illinois that where no *bona fide* doubt as to a defendant's competency to stand trial exists, a psychiatric report shows defendant fit and the defendant moves for or acquiesces in the withdrawal of a petition requesting a fitness hearing, there is no abuse of discretion where the court fails to hold a fitness hearing *sua sponte*. *People v. Hicks*, 35 Ill. 2d 390, 394, 220 N.E.2d 461 (1966); *People v. Mayhew*, 18 Ill. App. 3d 483, 488, 309 N.E.2d 672 (1974). Here, the August 28, 1996, psychiatric report from Dr. Markos showed that defendant was competent to waive his right to a fitness hearing from that point on.

■ On appeal, appellate counsel asserts that trial counsel was ineffective for refusing to ask for a fitness hearing after it was learned that defendant had been taking Sinequan. This exact issue was before our supreme court in *Cortes*. In *Cortes*, the court pointed out "[i]nstead, counsel opted to make the legal argument that under this court's prior precedent, the failure to afford defendant a fitness hearing under section 104—21(a) before his trial and sentencing automatically entitled him to a new trial. This was a sound strategy that counsel was not ineffective for attempting because, but for the advent of *Burgess*, it would have succeeded. See *Neal*, 179 Ill. 2d at 555." *Cortes*, 181 Ill. 2d at 277. The psychotropic medication at issue in *Cortes* was Sinequan and fitness examinations were done 17 months before trial and 11 months after trial. Here, defendant received a fitness examination two months after trial which found defendant to be fit. Thus, no violation of defendant's right to due process or effective assistance of counsel occurred under the facts of this case. Therefore,

defendant's request for a new trial based on his taking psychotropic medication is denied. Defendant's request to remand this case for a retrospective fitness hearing is similarly denied.

Defendant next contends that his conviction for armed robbery must be reversed because the State failed to prove beyond a reasonable doubt that the offense occurred in Cook County. Defendant specifically argues that the evidence shows that the armed robbery occurred in Du Page County.

■ To prove the offense of armed robbery, the State must prove that a defendant: (1) took property, except a motor vehicle; (2) used or threatened to use force; and (3) was armed with a dangerous weapon. 720 ILCS 5/18—1, 18—2 (West 1994).

■ Venue is a material allegation which, along with other elements, the State must prove beyond a reasonable doubt. *People v. Carroll*, 260 Ill. App. 3d 319, 327, 631 N.E.2d 1155 (1992). Venue may be proven by either direct or circumstantial evidence. *People v. Nash*, 221 Ill. App. 3d 544, 545, 582 N.E.2d 308 (1991). If a crime is partly committed in one county and partly in another, venue is proper in either county. *People v. Hagan*, 199 Ill. App. 3d 267, 286, 556 N.E.2d 1224 (1990); *People v. Clark*, 71 Ill. App. 3d 381, 396, 389 N.E.2d 911 (1979).

■ In a related claim, defendant contends that his conviction for armed robbery should be reversed and remanded for a new trial because the trial court erred in instructing the jury that it could find defendant guilty if the offense occurred in either Du Page County or Cook County. The defense requested that the jury be instructed with Illinois Pattern Jury Instructions (IPI), Criminal, No. 2.07 (3d ed. 1992), which would have informed the jury that the State must prove beyond a reasonable doubt that the offense of armed robbery occurred in Cook County. The trial court refused the instruction and instead instructed the jury with a non-IPI instruction listing either county. A jury must be instructed that the State is required to prove beyond a reasonable doubt that each element of the charged offense occurred in the county in which the crime was alleged to have been committed if the evidence raises a question of the propriety of venue. *People v. Turner*, 179 Ill. App. 3d 510, 520, 534 N.E.2d 179 (1989). However, there is no need to instruct the jury where venue is not a controverted issue in the case. *Turner*, 179 Ill. App. 3d at 520.

The facts in the instant case are very similar to those in *People v. Gilliam*, 172 Ill. 2d 484, 670 N.E.2d 606 (1996). In *Gilliam*, the defendant forced the victim into her car in Chicago and forced her to drive to a parking lot at Foster Avenue Beach, where he forced her into the car's trunk. According to defendant's confession, defendant drove the car to Jefferson County, where he took the victim from the trunk, beat

her to death with a tire iron, and left her body in a wooded area in Jefferson County. The defendant was tried in Jefferson County and convicted of first degree murder and robbery and was sentenced to death. On appeal, the defendant asked the supreme court to reverse his conviction of robbery of the victim's car, based on improper venue.

The supreme court disagreed. The court compared the venue considerations of a robbery charge with those of a theft charge. The court conceded that the robbery of the victim's car was completed in Cook County. The court continued:

"However, defendant's taking of the victim's car, *with the victim forced into the car trunk*, continued the essence of robbery, *i.e.*, the use of force. We note that other states commonly include robbery in their venue rules for theft. See 1 C. Torcia, Wharton's Criminal Procedure § 39 (13th ed. 1989).

Defendant continued to be as guilty of robbery in the field in Jefferson County as when the robbery occurred in Cook County. Therefore, we hold that defendant was properly tried in Jefferson County for the robbery of the victim's car." (Emphasis in original.) *Gilliam*, 172 Ill. 2d at 508.

In rejecting the defense claim that the trial court erred by refusing to instruct the jury on venue, the supreme court held that the evidence did not raise a question of the propriety of venue because the defendant continued to be guilty of robbery in Jefferson County.

■ Applying *Gilliam* to the facts of this case, we reject defendant's arguments based on venue. Even if we were to agree with defendant that the armed robbery may have taken place initially in Du Page County, the evidence shows that defendant continued to be guilty of armed robbery in Cook County. The car with the victim's body was recovered in Cook County. The evidence was overwhelming that defendant drove the car to the remote parking lot, thus continuing the armed robbery. Further, we note that the indictment states the following regarding the offense of aggravated kidnapping:

"He, knowingly, by force, carried Rachel Rachlin from one place, to wit: located at 32 West 60th Street in the City of Westmont, DuPage County, Illinois, to another, to wit: located at 10000 West O'Hare, in the City of Chicago, Cook County, Illinois, with the intent to secretly confine Rachel Rachlin against her will and committed a felony, to wit: armed robbery upon Rachel Rachlin in violation of Chapter 38, Section 10—2—A(3)) of the Illinois Revised Statutes, 1989 as amended ***."

This put the defense on notice of the locations of the offense and its continuing nature. Also, as the trial court pointed out, this case was tried by an assistant State's Attorney from Du Page County as well as an assistant State's Attorney from Cook County. While defen-

dant did request a bill of particulars from the State, he never requested that the case be transferred to Du Page County to correct any alleged deficiency in venue. The trial court commented on this when it held that defendant had waived this issue by not bringing it up until the instruction conference.

Moreover, " '[e]ven though error may have been committed in giving or refusing instructions it will not always justify reversal when the evidence of defendant's guilt is so clear and convincing that the jury could not reasonably have found him not guilty.' " *People v. Abdul-Mutakabbir*, 295 Ill. App. 3d 558, 563, 692 N.E.2d 756 (1998), quoting *People v. Ward*, 32 Ill. 2d 253, 256, 204 N.E.2d 741 (1965).

In our view, the evidence in the record of defendant's guilt is so overwhelming that a venue instruction was not required. Therefore, the trial court did not err in instructing the jury that it could find defendant guilty of armed robbery if the offense occurred in either Cook County or Du Page County.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY and ZWICK, JJ., concur.