NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180276-U

NO. 4-18-0276

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 8, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| MARQUISE T. BURNETT, | ) | No. 17CF759 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Knecht and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the State's evidence was sufficient to prove defendant guilty beyond a reasonable doubt and the trial court did not err in its Illinois Supreme Court Rule 431(b) (eff. Jul. 1, 2012) admonishments.

¶ 2    In January 2018, a jury found defendant, Marquise T. Burnett, guilty of first degree murder, a Class M felony (720 ILCS 5/9-1(a)(1) (West 2016)), and found the statutory enhancement alleging defendant personally discharged a firearm causing the death of another proved as well (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016)). In February 2018, defendant filed a posttrial motion, contending *inter alia* the State's failure to prove him guilty beyond a reasonable doubt, along with various evidentiary and instructional errors during trial. The trial court denied defendant's motion in May 2018 and sentenced him to 55 years in the Illinois Department of Corrections (DOC)—30 years for the offense plus the 25-year enhancement. Defendant's motion for reconsideration claimed his sentence was excessive and not considerate of his rehabilitative

potential, his age, and various other personal and family circumstances. The motion was denied, and defendant appeals.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant was originally charged by information with four counts of first degree murder based on each of the four mental states provided by statute. 720 ILCS 5/9-1(a)(1), (2) (West 2016). In each count, the State alleged defendant was eligible for the additional 25-year enhancement to be added to whatever sentence he may otherwise receive based on the personal discharge of a firearm that proximately caused the death of Darien Carter. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016).

¶ 5        The charges arose from an incident in June 2017 where Darien Carter was killed when two or more shooters opened fire on Carter and his brother Jeshaun Manning near Douglas Park in Champaign. The victim had been riding a bicycle in the vicinity of 508 Eureka Street, across from the park, at the time. The shooting occurred around 6 p.m. and was witnessed by several people and captured on a surveillance camera in the area. The victim died from multiple gunshot wounds, with five to the left side of his body including his back, chest, face, forearm, and superficially to the ear. He also had one gunshot wound to the right side of the abdomen. From six of the shell casings recovered at the scene, police were able to determine Carter had been shot by a .380-caliber semi-automatic pistol. They also found three .40-caliber casings lying in a line consistent with the path of flight taken by Jeshaun Manning when the shooting started. He was not hit. The surveillance camera showed Carter riding his bicycle in front of 508 Eureka Street when an individual, unidentifiable from the video, emerged from behind a car. The person began shooting Carter from behind at close range and continued firing and running after him as Carter attempted to flee toward 508 Eureka Street. Although the shooting can be seen on the

video, due to the quality of the video and the distance from the camera, the shooter could not be identified other than as "a black male wearing dark clothing." The individual shooting at the victim in the video can be seen standing in the street in the vicinity of where the .380-caliber shell casings were found. Manning testified he saw defendant standing in the vicinity of where police later retrieved the six .380-caliber shell casings.

¶ 6   Two people identified defendant as the person seen standing in the street near where six .380-caliber shell casings were found, including one who initially told the police he saw defendant shooting. Jeshaun Manning, the victim's brother, testified that before he began running from Isaiah Hunt, the individual shooting at him, Hunt had been standing with a group of people that included defendant on the park side of Eureka Street. James Mosley, who lived at 506 Eureka Street, testified that while he was in his garage, he heard gunshots and went inside the house to check on other family members. When he looked outside, Mosley saw defendant, whom he identified in open court as "G-Quise," running in the middle of Eureka Street. He said defendant entered his house with two others, and Mosley told them all to leave. He estimated they were inside the house for "five seconds, ten seconds" before he "coerced" them to leave. During his testimony, Mosley denied being able to identify his own handwriting and markings he placed on a map while talking to police later the same day which placed "G-Quise" in the middle of the street, testifying instead he was in a different location than he told police previously. At trial he did not recall having spoken to a detective, being shown the map, or placing his markings, including his name, on it to identify where he had seen defendant during the shooting. Mosley also denied telling an investigating detective he saw the shooting, testifying instead he "heard" the shooting. He denied telling the detective on the night of the shooting, "[t]he only thing I seen [*sic*] was the one person in the middle of the street shoot two more times" after

- 3 -

hearing "seven to eight shots" before that. He also denied telling the detective, "[t]he only person I really got to see, his name is G-Quise. I don't necessarily know his real name or anything, but I know I seen him fire shots."

¶ 7        Samaria Loatman, who lived with Mosley at 506 Eureka Street, testified that on the night in question she heard gunshots and lay down on the hallway floor with her brother. She identified defendant as one of three men who ran into their home that night. She described how they looked "panicking," and she testified she heard defendant say, "yeah b***, now you dead b***. Got that n***." She also heard defendant and another one of the three men, whom she identified as "Trap," say they "needed to get rid of the gun." Loatman described how, after the men left, she went next door to check on the woman who lived there and found the decedent, Darien Carter, lying on the kitchen floor. She remained with him for what she estimated to be 20 minutes, and when the police arrived, she returned to her own residence.

¶ 8        Detective Jim Bednarz, a 23-year veteran with the Champaign Police Department, was the lead investigator in the case. He interviewed defendant on June 7, 2017, five days after the shooting, because he could not be located before then. The interview was both audio- and video-recorded and eventually admitted into evidence without objection. Using an overhead map of the area where the shooting occurred, Detective Bednarz testified defendant placed himself in the middle of the street, where the .380-caliber shell casings were located, when asked where he was at the time of the shooting. Prior to this, defendant gave Bednarz several different versions of how he happened to be in the area. Initially, defendant claimed prior to the shooting "he was in traffic." When asked to identify whose car he was in, defendant then said he walked to the area. When asked where he walked from, defendant said he was "dropped off," but he could not remember who dropped him off.

¶ 9        Detective Bednarz also testified about his video-recorded interview with James Mosley, acknowledging Mosley identified a location also in the middle of the street where he said he saw defendant at the time of the shooting and marked it on the map. On cross-examination, Bednarz said Mosley described the clothes defendant wore on the night of the shooting as "a white shirt, blue jeans and gym shoes" and said he saw defendant "in the street with a gun." Bednarz testified that during the course of the interview, Mosley said "he saw [defendant] fire two rounds from the middle of the street." Bednarz reported there were six .380-caliber shell casings and four to five .40-caliber shell casings recovered from the scene.

¶ 10        The State presented testimony from forensic scientists about the caliber of the shell casings found. Since there were no firearms of the same caliber found, no ballistic testing was conducted. Likewise, there were no fingerprint or deoxyribonucleic acid comparison tests conducted. The testimony of a forensic pathologist established Darien Carter died of multiple gunshot wounds, and a stipulation from a forensic scientist indicated the bullet retrieved from his body was a .380/38-class caliber and all of the .380-caliber shell casings found were fired from the same gun.

¶ 11        Defendant presented no evidence. The jury found defendant guilty of first degree murder and found defendant personally discharged a firearm that proximately caused the death of another person.

¶ 12        Defendant filed a posttrial motion contending the State failed to prove him guilty beyond a reasonable doubt. The motion also alleged the trial court erred in denying defendant's motions for a directed verdict after the State's case and at the close of all the evidence, and it further erred by allowing certain instructions proposed by the State. Defendant also argued various infirmities with the verdict, the State's proof, rulings by the court, and lastly, claimed a

denial of due process "in that he was tried for First Degree Murder as both a principal and an accessory."

¶ 13        After a presentence investigation and report, the trial court first heard and denied defendant's posttrial motion and proceeded to sentencing. At sentencing, the State presented evidence in aggravation through several written victim impact statements and testimony from Detective Bednarz. The latter identified a Facebook page he discovered approximately one month prior to the hearing, which contained photographs of defendant displaying a weapon and making what Bednarz identified as hand gestures "usually associated with gang, gang membership." He testified to defendant's known involvement with the "Roc Block Gang" based on an internal Champaign police database. Detective Bednarz also described how, on the date of the shooting, the park across the street contained a number of children and several of the houses hit by stray gunfire during the shooting were inhabited at the time. Defendant presented no evidence in mitigation beyond that contained in the presentence investigation report. The State recommended a sentence totaling 85 years in DOC. Defendant's trial counsel recommended a sentence at or near the minimum of 45 years. The trial court discussed the relevant factors in aggravation and mitigation and sentenced defendant to 55 years—30 years on the murder count plus the statutory 25-year add-on for the firearm enhancement.

¶ 14        Defendant's appeal raises two issues. First, the State's evidence was insufficient to prove him guilty beyond a reasonable doubt due to its circumstantial nature and what he characterizes as the "implausible, contradictory statements" of two witnesses. Next, defendant contends the trial court plainly erred in its Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) admonishments.

¶ 15                                II. ANALYSIS

- 6 -

¶ 16                                    A. Sufficiency of the Evidence

¶ 17          "When reviewing a challenge to the sufficiency of the evidence in a criminal case,

the relevant inquiry is whether, when viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt. [Citations.]" (Internal quotation marks omitted.) *People v. Hinthorn*,

2019 IL App (4th) 160818, ¶ 89, 146 N.E.3d 122. "The trier of fact has the responsibility to

determine the credibility of witnesses and the weight given to their testimony, to resolve

conflicts in the evidence, and to draw reasonable inferences from that evidence." *Hinthorn*, 2019

IL App (4th) 160818, ¶ 89. When considering the sufficiency of the State's evidence, the

reviewing court does not retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8, 944 N.E.2d

319, 322 (2011). "A conviction will be reversed only where the evidence is so unreasonable,

improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People

v. Belknap*, 2014 IL 117094, ¶ 67, 23 N.E.3d 325.

¶ 18          To sustain a conviction for first degree murder as charged in this case, the State

was required to prove beyond a reasonable doubt that defendant, or one for whom he was legally

accountable, performed the acts which caused the death of the victim with either the intent to kill

or do great bodily harm, and had knowledge his acts would cause death to the victim or

knowledge his acts created a strong probability of death or great bodily harm to the victim. Since

the State sought the 25-year statutory enhancement, it also had to prove beyond a reasonable

doubt that during the commission of the murder, defendant personally discharged a firearm that

proximately caused the death of the victim.

¶ 19          Defendant contends the fact that he was both circumstantially and by his own

admission not only present at the scene of the crime but at the location where the six .380-caliber

- 7 -

shell casings were found, was seen firing two rounds from that location, and was overheard immediately after the shooting saying, "[y]eah b***, now you dead b***. Got that n***" and stating they "needed to get rid of the gun," is insufficient because it is circumstantial and based on what defendant describes as "implausible, contradictory statements of two witnesses." "Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Hall*, 194 Ill. 2d 305, 330, 743 N.E.2d 521, 536 (2000). "The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541, 708 N.E.2d 365, 369 (1999).

¶ 20        In the case before us, the jury had the opportunity to consider the impeachment or inconsistencies of the witnesses who testified. The victim's brother, Jeshaun Manning, placed defendant at the scene with others, including "Isaiah," who started shooting at him. James Mosley, who obviously "flipped" on the State once he was called to testify, previously told police on the night of the shooting he saw defendant running in the direction of 506 and 508 Eureka Street. During his testimony, he could not recall having marked defendant's location on a map which coincided with where the .380-caliber shell casings were found. Although he previously told police he saw defendant "running in the middle of the street" and saw him fire the last two shots in the direction of 508 Eureka Street, during his trial testimony he described a different location and said he "heard" the last two shots he previously attributed to defendant. When confronted with his earlier statements to police, Mosley said, in some instances, he could not recall, but he acknowledged his memory of events would have been better on the night of the incident. The State had his previous statement played to the jury and, without objection, admitted

it as substantive evidence pursuant to statute. See 725 ILCS 5/115-10.1(a) (West 2016) (admissibility of prior inconsistent statements).

¶ 21 Samaria Loatman said defendant and two others entered her residence at 506 Eureka Street, next door to where the victim was found, immediately after the shooting stopped, looking like they were "panicking," "like they were like all shooken [*sic*] up and they were looking like—thinking, I guess, what they are going to do now like." She also testified that while in the house defendant said, "Yeah, b***, now you dead, b***. Got that n***." Loatman heard defendant talking with "Trap" about how "they needed to get rid of the gun." She also described how, when defendant and the two others left her residence, they ran into the backyard, which was consistent with the testimony of her neighbor Cesar Patino, whose backyard abutted 506 Eureka Street. Patino testified, after hearing gunshots coming from behind his house, he looked out a back window and saw three "young black guys" jumping a fence and running off. Loatman also told of going to 508 Eureka Street (the residence Mosley had previously identified as the direction defendant had been running when he fired the two shots), finding the decedent lying on the kitchen floor, and staying with him until police arrived. She was not cross-examined about the substance of defendant's statements or her observations of his demeanor, instead being asked about the sequence of events.

¶ 22 Officer Cully Schweska described the arrest of defendant in a vehicle which had attempted to flee from the police. Detective Bednarz testified no one was able to locate defendant until five days after the shooting. Defendant's statement to Detective Bednarz was played for the jury, and they were able to see and hear defendant's responses to questions. They heard him say initially that before the shooting he was "in traffic," and when asked in whose car, he said instead that he walked to the location of the shooting. When asked where he walked from, he

said he was "dropped off," and then that he could not remember who dropped him off. The .380-caliber shell casings were found near defendant's described location during the shooting.

¶ 23    The jury heard the inconsistencies in the testimony of Mosley and Loatman and chose to give them less weight than defendant argues they should. It is arguable the description of defendant's clothing on the night of the shooting given by Mosley to the police (white shirt, blue jeans, and gym shoes) is different than that given by the neighbor, Patino, who saw three individuals jump his fence (one wearing a gray shirt and jeans, another wearing a black or dark blue shirt and jeans, the third subject wearing a striped shirt and jeans). It is also arguably different than what could be observed on the neighborhood surveillance video, described by one police witness as "grainy" and appearing to show the shooter is a black male wearing dark clothing. However, the jury had more information than that. It was in the best position to weigh the credibility of the witnesses and the statement of defendant to police.

¶ 24    The standard of review applicable in this case "does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81, 903 N.E.2d 388, 406 (2009). Further, the *Jackson* court said, we are to apply this standard, *i.e.*, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[,] *** regardless of whether the evidence is direct or circumstantial, [citation], [because] circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction." (Emphasis in original and internal quotation marks omitted.) *Jackson*, 232 Ill. 2d at 280-81. Defendant raises a number of inferences from what he considers the differing testimony of Loatman and Mosley; however, we are to allow all *reasonable* inferences from the record in

- 10 -

favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42, 987 N.E.2d 386. Testimony may be found insufficient under the *Jackson* standard, but only "where the record evidence compels the conclusion that *no reasonable person* could accept it beyond a reasonable doubt." (Internal quotation marks omitted and emphasis added.) *People v. Gray*, 2017 IL 120958, ¶ 36, 91 N.E.3d 876.

¶ 25　　　　　Once we apply the *Jackson* standard to the facts presented to the jury, we are unable to conclude no reasonable person could accept them as true. Defendant would like us to draw different inferences and give greater weight to certain aspects of the testimony than others—the functions of the trier of fact. "The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *People v. Wheeler*, 226 Ill. 2d 92, 114-15, 871 N.E.2d 728, 740 (2007). "[E]ven the trier of fact is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *** Accordingly, this court is not required to search out all possible explanations consistent with innocence or be satisfied beyond a reasonable doubt as to each link in the chain of circumstances." (Internal quotation marks omitted.) *Wheeler*, 226 Ill. 2d at 117. As a result, we find the record evidence reasonably supports a finding of guilty beyond a reasonable doubt.

¶ 26　　　　　　　　　B. Rule 431(b) Admonishments

¶ 27　　　　Defendant also contends the trial court failed to give proper Rule 431(b) admonishments, which warrants reversal. Defendant raises this issue for the first time on appeal, contending we should consider it as "plain error."

¶ 28            As defendant acknowledges, the question of whether the trial court violated Rule

431(b) is reviewed *de novo*. *People v. Wilmington*, 2013 IL 112938, ¶ 26, 983 N.E.2d 1015.

Since defendant asks us to consider the issue as plain error, the first step in a plain error analysis

is to determine whether there was error at all, and the burden rests with the defendant. *People v.*

*Kinnerson*, 2020 IL App (4th) 170650, ¶ 58. The Illinois Supreme Court recently explained

"plain error" thusly:

> "A reviewing court will consider unpreserved error when a clear or
>
> obvious error occurs and (1) the evidence is so closely balanced
>
> that the error alone threatened to tip the scales of justice against the
>
> defendant, regardless of the seriousness of the error or (2) the error
>
> is so serious that it affected the fairness of the defendant's trial and
>
> challenged the integrity of the judicial process, regardless of the
>
> closeness of the evidence. [Citations.] When a defendant fails to
>
> establish plain error, the result is that his procedural default must
>
> be honored." *People v. Jackson*, 2020 IL 124112, ¶ 81.

¶ 29            Defendant claims the first of the two—that the trial court's Rule 431(b)

admonishments were so deficient they failed to ensure the potential jurors understood and

accepted each of the four principles enumerated. What he characterizes as the trial court's "clear

and obvious error," "tipped the scales of justice against [defendant] in this closely balanced

case." We do not necessarily dispute the closeness of the evidence. As defendant accurately

noted, the case was primarily circumstantial, as there was no physical or forensic evidence

connecting him to the shooting. It boiled down to an issue of the identity of the shooter, gleaned

from a "grainy" surveillance video and two witnesses, neither of whom actually saw him

shooting at the victim. On the issue of the court's alleged "clear and obvious error," let us look at the record.

¶ 30        Before the trial court began questioning the venire, it provided certain preliminary instructions. These included the following:

> "The defendant is presumed to be innocent, and that presumption remains with him throughout the case and is not overcome unless from all the evidence, you are convinced beyond a reasonable doubt that the defendant is guilty. Before the defendant can be convicted, the State must prove him guilty beyond a reasonable doubt. The burden of proof is on the State, and that burden never shifts. The defendant is not required to prove his innocence or to present evidence. The defendant is not required to testify. If the defendant does not testify, the fact that he did not testify may not be considered by you in any way."

¶ 31        The trial court then began individual questioning of prospective jurors in groups of four, during which the court stated:

> "It is essential that each juror understand and accept the fundamental principles of law that apply, and I am required to ask you each individually about them. Those principles are that the defendant is presumed innocent of the charge against him. Before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt. The defendant is not required to

offer any evidence on his own behalf. And if a defendant does not

testify, that cannot be used against him."

¶ 32    The trial court's inquiry of each individual juror went as follows:

"THE COURT: Juror number 48, do you understand and accept

each of these principles?

JUROR NO. 48: Yes, I do.

THE COURT: Juror number 50, do you understand and accept

each of these principles?

JUROR NO. 50: Yes, I do.

THE COURT: Juror number 38, do you understand and accept

each of these principles?

JUROR NO. 38: Yes, I do.

THE COURT: And juror 138, do you understand and accept each

of these principles?

JUROR NO. 138: Yes."

¶ 33    Because of the trial court's procedure for the exercise of peremptory challenges

by trial counsel, whenever a juror was stricken, the replacement was admonished as follows:

"THE COURT: There are certain fundamental principles of law

that apply in this case so I'm required to ask you each individually

about them. Those principles are that the defendant is presumed

innocent of the charges against him. Before a defendant can be

convicted, the State must prove the defendant guilty beyond a

reasonable doubt. The defendant is not required to offer any

- 14 -

evidence on his own behalf. And if a defendant does not testify, it can not be held against him. Do you understand and accept each of these principles?

[REPLACEMENT] JUROR: Yes, sir."

¶ 34       This occurred each time either counsel asked to exercise a peremptory challenge on any of the four prospective or replacement jurors, which means the three jurors remaining heard the same four principles and questions regarding "understanding" and "accepting" numerous times.

¶ 35       The same process outlined above was repeated for each of the two remaining panels of four prospective jurors, with repetition for any replacement jurors selected after the exercise of a peremptory challenge by either side. It was repeated again for the selection of two alternate jurors.

¶ 36       Defendant contends that by reading all four Rule 431(b) principles and then asking each juror individually whether he or she understood and accepted those principles, the trial court committed "clear error." Of course, that must be his allegation to get in the plain error door. We already know, "[a]lthough compliance with Rule 431(b) is important, violation of the rule does not necessarily render a trial fundamentally unfair or unreliable in determining guilt or innocence." *People v. Thompson*, 238 Ill. 2d 598, 611, 939 N.E.2d 403, 412 (2010). Defendant cites several cases from other appellate districts in support of his claim that merely combining the four principles alone is plain error. As the State noted in its reply brief, each of the cases cited suffered from a greater infirmity in that either the principle was misstated or omitted, or the jurors were not asked if they "understood" and "accepted."

¶ 37          Contrary to defendant's claim, this court, and others, have approved (although perhaps not encouraged) the combining of the four principles. We approved the combining of the four principles into a single statement of the law, followed by questioning of jurors in smaller groups, recently in *Kinnerson*, 2020 IL App (4th) 170650, ¶ 62. See also *People v. Willhite*, 399 Ill. App. 3d 1191, 1197, 927 N.E.2d 1265, 1270 (2010); *People v. Dismuke*, 2017 IL App (2d) 141203, ¶ 56, 79 N.E.3d 864. Here, defendant received the further benefit of individual questioning of prospective jurors on whether they "understood" and "accepted" each of the principles, which *Thompson* expressly approved. *Thompson*, 238 Ill. 2d at 607. In *Kinnerson*, we noted even "*Thompson* does not interpret Rule 431(b) as requiring a process wherein the court addresses each principle 'separately.' Rule 431(b) also contains no such requirement." *Kinnerson*, 2020 IL App (4th) 170650, ¶ 62. The plain language of the rule does not require "the trial court to ask jurors individually about each principle or receive their answers one by one." (Internal quotation marks omitted.) *Kinnerson*, 2020 IL App (4th) 170650, ¶ 64.

¶ 38          As a result, there was no error, clear or otherwise; and without error, there is no need to proceed further with a plain error analysis. See *People v. Hood*, 2016 IL 118581, ¶ 18, 67 N.E.3d 213.

¶ 39                              III. CONCLUSION

¶ 40          For the reasons set forth above, we affirm the judgment and sentence of the trial court.

¶ 41          Affirmed.