NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 180687-U

NO. 4-18-0687

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 23, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| CHARLES L. FITZPATRICK, | ) | No. 17CF1575 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James R. Coryell, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1      *Held*:   The trial court's Rule 431(b) admonishments were appropriate, defendant was not
denied a fair trial, and the court's sentence was not excessive.

¶ 2      In October 2017, defendant, Charles L. Fitzpatrick, was charged by information

with five offenses, including: attempt (first degree murder) a Class X felony, punishable by 6 to

30 years' incarceration, with a special sentencing add-on of 25 years to life due to an aggravating

factor, *i.e.*, personal discharge of a firearm causing great bodily harm (count I) (720 ILCS

5/8-4(a), (c)(1)(D), 9-1(a)(1) (West 2016)); aggravated battery with a firearm, a Class X felony,

punishable by 6 to 30 years' incarceration (count II) (720 ILCS 5/12-4.2(a)(1) (West 2016));

aggravated discharge of a firearm, a Class 1 felony punishable by 4 to 15 years' incarceration

(count III) (720 ILCS 5/24-1.2(a)(2) (West 2016)); unlawful possession of a weapon by a felon,

a Class 2 felony punishable by 3 to 14 years' incarceration (count IV) (720 ILCS 5/24-1.1(a)

(West 2016)); and unlawful possession of a weapon by a felon, a Class 2 felony punishable by 3

to 14 years' incarceration (count V) (720 ILCS 5/24-1.1(a) (West 2016)). In November 2017, the State filed an additional count alleging armed habitual criminal, a Class X felony (count VI) (720 ILCS 5/24-1.7(a) (West 2016)).

¶ 3        In July 2018, the case proceeded to a jury trial on counts I and II after the State moved to dismiss counts III-V and the court granted defendant's motion to sever count VI. After a three-day trial, the jury found defendant guilty of both counts and found the State proved the aggravating factor of great bodily harm caused by defendant personally discharging a firearm. After a presentence investigation and report, defendant was sentenced to 30 years in the Illinois Department of Corrections (DOC) on count I (attempt (first degree murder)) with a 35-year enhancement plus 3 years of mandatory supervised release. Defendant's motion to reconsider the sentence was denied, and defendant appeals.

¶ 4                                I. BACKGROUND

¶ 5        In October 2017, defendant was charged with attempt (first degree murder), aggravated battery with a firearm, aggravated discharge of a firearm, and two counts of unlawful possession of a weapon by a felon arising from the shooting of 70-year-old Rafael Graham in Decatur. Graham was driving his 2004 BMW on a city street at around 6:15 p.m. when he encountered "an entourage of hooded people" in the middle of the street. As Graham attempted to maneuver around them, he heard a loud noise and realized his passenger side mirror had been broken off. When he stopped the car, a person he later identified as defendant knocked on the passenger-side window, so Graham rolled it down. The defendant leaned into his car, telling Graham, " 'You hit me.' " When Graham suggested calling 9-1-1, the person he identified as defendant told him to go ahead if he wanted to but that Graham had " 'f***ed up and you going to pay me.' " Graham told the person he had no money, then heard four gunshots and realized he

had been shot. He never testified to having seen defendant holding a gun and did not see any muzzle flashes at the time shots were fired. However, he identified defendant as the person who was crouched down and leaning inside his passenger-side window when the shots were fired. Graham was hit by three of the four shots, one through his right arm and two to his right lower torso. He eventually had to undergo surgery for a lacerated liver.

¶ 6        Graham identified defendant in a photo line-up prepared and conducted by the Decatur police, and defendant was arrested. An eyewitness, Christina Anderson, identified defendant as the person she saw leaning into the passenger-side window of Graham's car immediately before she heard several gunshots. All the individuals seen in the vicinity of Graham's car fled immediately after the gunshots. No gun was found at the scene; however, four .380-caliber shell casings were found both inside and outside the car, and two slugs were found inside, one in the console and one on the driver's seat.

¶ 7        Officers arrested defendant almost a week later at his residence, which was seven or eight blocks from the shooting, and executed a search warrant, recovering a cell phone with defendant's identification attached. Defendant's cell phone records were obtained through a separate search warrant and were stipulated into evidence by the parties. From those records, Decatur police were able to place defendant's phone within 200 meters of the scene at the time of the shooting.

¶ 8        In July 2018, defendant proceeded to trial. As part of its case-in-chief, over defendant's objection, the State was permitted to elicit testimony from defendant's parole agent and a representative of the electronic monitoring service associated with the ankle monitor defendant was required to wear at the time. The ankle bracelet records revealed that on the date of the shooting, defendant was away from his residence from 4:53 p.m. to 6:59 p.m.—a period

which encompassed the shooting at approximately 6:15 p.m. Defendant's parole agent testified his absence was authorized but that defendant failed to attend a scheduled meeting that same evening at 7:20 p.m. and failed to appear for another the next day at 11:01 a.m. The jury was instructed this evidence was admitted solely to establish defendant's physical location and state of mind.

¶ 9        Defendant elected not to testify in his own defense, and the jury found defendant guilty of the two counts remaining after the State had earlier moved to dismiss three counts and agreed to a severance of the later filed armed habitual criminal count. According to the trial court's docket entry, after three days of trial, the jury retired to deliberate at 3:28 p.m. and returned verdicts of guilty at 4:21 p.m.

¶ 10       Defendant's posttrial motion, filed in August 2018, claimed: (1) defendant was not proved guilty beyond a reasonable doubt, (2) the trial court erred in permitting evidence of defendant's parole status and electronic monitoring, (3) the trial court erred in overruling three specific testimonial objections, and (4) the trial court erred in admitting two exhibits and three photographs over defendant's objection. The trial court denied defendant's motion.

¶ 11       Defendant was sentenced in September 2018. At sentencing, the victim, Rafael Graham, read his victim impact statement, and the State presented four police witnesses in aggravation. Officer Scott Gilman testified about an incident in May 2009 where defendant became involved in an altercation at the drive-thru window of a local McDonald's. The driver of the vehicle in which defendant was a passenger began arguing with the employee when the victim, who was the night manager, attempted to intervene. When she did, defendant exited the passenger side of the car, approached the drive-thru window, and sprayed her in the face with pepper spray. Apprehended shortly thereafter and identified by the victim at the scene during a

show-up, defendant admitted spraying her with the pepper spray. As a result, defendant was charged with aggravated battery in Macon County case No. 09-CF-842, for which he received a sentence of three and a half years in DOC.

¶ 12 Detective Brian Kaylor of the Decatur Police Department testified about his investigation of a shooting at a Decatur nightclub in March 2012 in which five people were shot. Only one of the five victims could positively identify defendant as the shooter, although several others placed him at the scene or were less than positive he was the person who shot them. According to the victims, defendant entered the club after a fight began inside, firing six to seven rounds and hitting the various victims. Multiple .45-caliber shell casings were found at the scene, all determined to have been fired from the same gun. When apprehended, defendant admitted being present but denied the shooting. The victim who positively identified him eventually became uncooperative and failed to appear. Defendant ultimately pleaded guilty to possession of a weapon by a felon for 12 years in DOC.

¶ 13 Detective Appenzeller, the lead detective in this case, testified to the execution of arrest and search warrants on defendant's residence in October 2017, where officers found defendant along with 10 individually packaged baggies of heroin, 5 separate packages of crack cocaine, a bag containing 10 grams of cocaine, and a .45-caliber Colt revolver previously stolen from the Mt. Vernon Police Department. Defendant acknowledged ownership of the drugs and firearm.

¶ 14 The State also called Lieutenant Chris Thompson of the Macon County Sheriff's Office to testify about defendant's behavior while incarcerated pretrial. Thompson described an incident from February 2018 where defendant was found to have engaged in mutual combat with another inmate. When advised of the consequences, Thompson said defendant indicated "he

didn't care about disciplinary segregation" and when threatened with "deadlock" defendant acted "[a]s if he didn't care." After receiving 10 days disciplinary deadlock for this incident, in June 2018, defendant again was involved in a physical altercation with another inmate. The surveillance footage revealed defendant approaching another inmate, grabbing him, and pushing him against the wall. The inmate neither resisted nor fought back. Defendant then resisted the responding correctional officers from the time they attempted to restrain him until being uncuffed in the disciplinary unit. Defendant received six days' disciplinary deadlock from this incident.

¶ 15        Lieutenant Thompson then told about an incident approximately one week before sentencing where defendant reported to a counselor that "he would be taken out 'by suicide by cop' if he received more than the minimum sentence" in this case, telling the counselor "he would not make it to prison." As a result of this incident, prior to proceeding to sentencing in September and pursuant to *People v. Boose*, 66 Ill. 2d 261, 362 N.E.2d 303 (1977) (codified in Illinois Supreme Court Rule 430 (eff. July 1, 2010)), the trial court granted the State's motion seeking to have defendant shackled at the sentencing hearing.

¶ 16        Officer Malcolm Livingston of the Decatur Police Department, the State's last witness in aggravation, described an incident from April 2009 where defendant was found in a residence after the landlord complained about a tenant being bullied by drug dealers who used a residence to sell drugs. When officers arrived and knocked, defendant, whose name was not on the lease, could be seen inside on a couch. He refused to come to the door and the officers eventually gained access through the landlord. A search revealed a clear plastic bag containing eight individually tied plastic bags found to contain crack cocaine, a gun, and a box of ammunition on the couch officers observed defendant on when they first arrived.

¶ 17        Defendant presented no evidence in mitigation, and after being advised of his right to allocution, defendant declined. The State recommended a life sentence, citing defendant's criminal history, including violence and gun possession. They noted defendant was on parole for the weapons offense arising out of the nightclub shooting when he committed this offense. They pointed out his behavior while incarcerated, as well as the circumstances of this offense, concluding, "we are asking for a life sentence to protect this community and deter him from further conduct and also to deter others." Defendant's counsel, maintaining this was a case of mistaken identity, acknowledged defendant's criminal history and argued a sentence "along the lines of 35 years" was more appropriate.

¶ 18        The trial court began its comments with a recognition of the "statutory aggravating and mitigating factors found in the Code of Corrections," noting physical harm was inherent in the offense and therefore not an aggravating factor. The court then listed each of the statutory factors in mitigation which might have been relevant to the offense and found none were applicable to the facts of this case. In aggravation, the court mentioned defendant's history of criminality, the need to deter others, and the victim being over 60 years of age. The court also pointed out defendant's "history of violence that's, essentially, unprovoked" and noted defendant was found in possession of a firearm within days of this offense. The trial court ultimately sentenced defendant to 30 years' imprisonment on the attempt (first degree murder) count with 35 years for the add-on for personally discharging the firearm, for a total of 65 years to be served at 85% along with three years of mandatory supervised release. The court vacated the aggravated battery with a firearm count since it was the same act as the one for which defendant was being sentenced, and the State dismissed the severed count VI considering the sentence imposed in this case. Defendant was advised of his appeal rights.

¶ 19      Within days of the sentencing hearing, defendant filed a motion seeking to reconsider his sentence, arguing (1) the trial court abused its discretion in imposing an excessive sentence and (2) the sentence was in violation of section 5-5-4 of the Unified Code of Corrections (730 ILCS 5/5-5-4 (West 2016)) in that it constituted a resentencing of defendant which was "more excessive than the original sentence." Defendant's second claim was based on the fact the trial court initially sentenced defendant to 40 years' incarceration for attempt (first degree murder) with a 25-year add-on, realized its mistake, recalled the matter, and issued a clarification, explaining later that it misspoke, sentencing defendant to 30 years' incarceration plus a 35-year add-on. The trial court denied defendant's motion. Defendant raises no issue in this regard on appeal.

¶ 20                          II. ANALYSIS

¶ 21      Defendant asserts three claims of error: (1) the trial court failed to give proper Rule 431(b) admonishments to prospective jurors (see Ill. S. Ct. R. 431(b) (eff. July 1, 2012)); (2) defendant was denied a fair trial when unduly prejudicial evidence of his parole status, electronic monitoring, and missed appointments with his parole officer was admitted and the prejudice outweighed any minimal probative value; and (3) defendant's sentence is excessive since the trial court failed to consider the circumstances of defendant's childhood, mental health condition, and potential for rehabilitation.

¶ 22              A. Sufficiency of Rule 431(b) Admonishments

¶ 23      Once again, we are asked to address the issue *de jour*, Rule 431(b) admonishments raised for the first time on appeal. Despite our repeated affirmance (although perhaps not encouragement) of the process engaged in here, this issue continues to arise, and like the ancient Kraken, we could only hope "[i]n roaring he shall rise and on the surface die."

Alfred, Lord Tennyson, *The Kraken* (1830). Now that our supreme court has spoken in *People v. Birge*, 2021 IL 125644, perhaps it will.

¶ 24    Defendant contends the trial court committed "clear and obvious" error when it "failed to implement the precise question-and-response framework required by the Illinois Supreme Court." There are two things wrong with this statement: (1) we, and several other districts, have found this not only is not "clear and obvious" error, but is no error at all and (2) the Illinois Supreme Court has never "required" a precise question-and-response framework. More importantly, *Birge* has now made it clear questioning as occurred here complies with Rule 431(b) and the previous holdings of the Illinois Supreme Court.

¶ 25    Defendant's claim here, as in *Birge*, was that the trial court's "collapsing" of the four *Zehr* (*People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984)) principles into one statement of the law violates the Illinois Supreme Court's directives in *People v. Thompson*, 238 Ill. 2d 598, 607, 939 N.E.2d 403, 410 (2010).

¶ 26    Whether a trial court has violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and if so, the effect of noncompliance, is reviewed *de novo. People v. Wilmington*, 2013 IL 112938, ¶ 26, 983 N.E.2d 1015; see also *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 37, 959 N.E.2d 693. The rule is simple—the trial court is to ask each prospective juror whether that juror *understands* and *accepts* the following principles: "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her[.]" Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 27    In this case, the trial court couched its questions to the first panel of 14

prospective jurors as follows:

> "This is a criminal trial. Because it is, there are certain rules that apply. I'm going to ask each of the individual jurors if they understand and accept these rules: The defendant, Mr. Fitzpatrick, is presumed to be innocent of the charges against him. Before he can be convicted, the State must prove his guilt beyond a reasonable doubt. He is not required to offer any evidence on his own behalf and if he makes a decision not to testify, that can't be held against him."

¶ 28        What defendant fails to note in his brief is that the trial court then inquired individually of each prospective juror, by name, "do you understand and accept those principles?" One member of the first panel indicated he did not hear very well, and after inquiring of the remainder, the trial court went back to the juror with the hearing problem, repeated each of the four principles, almost verbatim, and then asked, "do you understand and accept those principles?" All 14 prospective jurors answered affirmatively.

¶ 29        For the next panel of six prospective jurors, the trial court stated as follows:

> "There are certain principles that apply to all criminal cases. I will go over those with you and I'd ask each of you to tell me if you understand and accept those principles: The defendant is presumed to be innocent of the charge against him. Before he can be convicted, the State must prove his guilt beyond a reasonable doubt. He is not required—the defendant is not required to offer any evidence on his own behalf and if the defendant makes a

decision not to testify, it cannot be held against him."

¶ 30        Again, each of the six was asked individually and by name whether they understood and accepted those principles, and each answered affirmatively. This method is almost verbatim the method recently given our supreme court's imprimatur of compliance with Rule 431(b). See *Birge*, 2021 IL 125644, ¶ 38

¶ 31        Although defendant asks us to consider the issue under the plain-error doctrine, the first step in any such analysis is to determine whether there was error at all, and the burden of persuasion rests with the defendant. *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 58. Even before, and including our order in *Birge*, we repeatedly approved the grouping of all four *Zehr* principles into one recitation in *Kinnerson*, *People v. Hartfield*, 2020 IL App (4th) 170787, ¶ 59, *People v. Willhite*, 399 Ill. App. 3d 1191, 1196-97, 927 N.E.2d 1265, 1270 (2010), and *People v. Bowens*, 407 Ill. App. 3d 1094, 1105, 943 N.E.2d 1249, 1262 (2011) (a brief delay between the recitation of principles and asking jurors whether they understand and accept them was not error). More recently, we approved the grouping of *Zehr* principles in a series of unpublished Rule 23 cases (see Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021)): *People v. Birge*, 2019 IL App (4th) 170341-U, ¶ 32, *People v. Mayen*, 2020 IL App (4th) 170632-U, ¶¶ 78-79, *People v. Fukama-Kabika*, 2020 IL App (4th) 170809-U, ¶ 19, *People v. Burnett*, 2020 IL App (4th) 180276-U, ¶ 37, and *People v. Muraida*, 2021 IL App (4th) 180650-U, ¶¶ 40-41. As a result, the absence of error precludes further plain-error review. *People v. Downs*, 2015 IL 117934, ¶ 33, 69 N.E.3d 784.

¶ 32        As the supreme court noted, neither the rule nor the supreme court require the trial court to address each principle "separately." *Birge*, 2021 IL 125644, ¶ 34. We now have clear direction from the Illinois Supreme Court sufficient, hopefully, to put this issue to rest.

¶ 33                          B. Defendant's Parole Status

¶ 34        Next, defendant contends he was denied a fair trial when the State was permitted

to present evidence defendant was on electronic monitoring and missed meetings with his parole

officer. Defendant contends the unfair prejudice created by this evidence outweighed any

probative value and its admission was an abuse of the trial court's discretion.

¶ 35        The admissibility of evidence rests within the sound discretion of the trial court,

and its decision will not be disturbed absent an abuse of that discretion. *People v. Chambers*,

2016 IL 117911, ¶ 75, 47 N.E.3d 545. "An abuse of discretion occurs only where the trial court's

decision is 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would

agree with it.' " *People v. Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985 (quoting *People v.*

*Rivera*, 2013 IL 112467, ¶ 37, 986 N.E.2d 634). Other crimes evidence is admissible if relevant

for any purpose other than to show a defendant's propensity to commit crimes. *People v. Pikes*,

2013 IL 115171, ¶ 11, 998 N.E.2d 1247.

¶ 36        Here, the State sought the introduction of defendant's electronic monitoring

records to show he was not at home on the date and time of the shooting. Although defendant

argues on appeal this was not contested at trial and therefore unnecessary, in reality, at trial it

was not acknowledged or stipulated by defendant. In fact, on the date of trial, defendant filed an

additional answer to discovery asserting an alibi defense, listing a witness in support of that

defense and an assertion the witness would testify defendant and he "were together at the time of

the offense and not at the location of the offense." During a trial recess, the State mentioned its

intention to call a representative from the company charged with monitoring the electronic ankle

bracelet defendant wore while on parole to establish defendant was away from his home during

the time of the shooting. The representative and the relevant records had been disclosed in a

supplemental answer to discovery filed by the State five days before trial. The State also intended to call defendant's parole officer to testify defendant called him on the day of the shooting to obtain permission to be away from his home at a time which corresponded with the time of the shooting. Contrary to defendant's argument here, at trial there was no acknowledgment defendant was present at the scene or was away from his home during the time of the shooting. The most defense counsel was willing to say when arguing against admission of this evidence was that "certainly *if* I try to elicit information from anyone that my client was at his home, then it might become relevant—or would become relevant for impeachment purposes." (Emphasis added.) Identification was the issue throughout, and since defendant elected not to testify, evidence tending to show defendant was not at home was relevant.

¶ 37        During the State's case-in-chief, and sometime after the trial court ruled the ankle monitor and defendant's missed appointments were admissible for the limited purpose of defendant's location and later state of mind, the defense said they were withdrawing their alibi defense and defendant did not intend to testify about his location at the time of the shooting. That decision changed, however, once the court ruled his parole status was relevant and counsel withdrew his waiver. Contrary to the record, defendant now claims he was no longer asserting an alibi defense and therefore the prejudicial effect of the ankle monitor readings and missed appointments outweighed any probative value.

¶ 38        Defendant's argument ignores two important points. First, regardless of whether defendant testified, to meet its burden, the State must still place him at or near the scene of the shooting at the relevant time. If the State failed to do so, defendant remained free to argue the absence of evidence indicated he was anywhere but home at the time of the shooting. Second, defendant ignores how the relevance of the ankle monitor evidence changed during the trial.

Initially, it was intended to show he was outside his home at the time of the shooting. Later, once defendant indicated his intent to abandon the alibi defense, the State argued the monitor records revealed defendant returned home very shortly after the shooting. This was corroborative of telephone records putting him between 200 to 400 meters of the shooting when it occurred. The trial court found this to be highly relevant, and we agree.

¶ 39        Any time identity is the issue in a case such as this, the ability to place the defendant at the location in question is paramount. This is even more true once defendant elected not to withdraw his alibi defense. Regardless, defendant did not have to maintain the defense to be able to argue the State's failure to place him at the scene, and in fact, he argued exactly that during his closing argument:

> "so you've got this evidence about the phone records. All right.
> What does that show us. Does it show us he was at the shooting.
> No. It shows that his phone was in the vicinity of the shooting. It is
> reasonable to say that it's probably him in that area. Okay. I'll say
> that's a reasonable inference from circumstantial evidence. But
> does that mean he was at the shooting. No. He is in his
> neighborhood. That's where he lives. Everybody said that's where
> he lives. He's 780 meters away from this."

¶ 40        Defendant's counsel then argued it would have been reasonable for him to come to the scene once he saw squad cars and lights and with the possibility of a police scanner or scanner application on his phone. This is in direct contradiction of the evidence from the ankle monitor indicating he returned *to* his home shortly after the shooting. Defendant's location before, during, and after the shooting were all questions of relevance for the trial court to weigh

and were not undisputed facts as argued by defendant on appeal. The admission of times from defendant's ankle monitor were relevant to establish the key issue in the case, identity. Furthermore, defendant's failure to attend two meetings with his parole officer shortly after the shooting was relevant to defendant's state of mind after the shooting. The court agreed there was no need to disclose the purpose of the meetings or the repercussions defendant could suffer for failing to attend, but merely that defendant missed them.

¶ 41    "Other-crimes evidence is admissible to show *modus operandi*, intent, motive, identity, or absence of mistake with respect to the crime with which the defendant is charged." *Pikes*, 2013 IL 115171, ¶ 11. The trial court was within its discretion in admitting the evidence, and we will defer to the trial judge "who was better able to decide the effect of the evidence on the jury." *People v. Illgen*, 145 Ill. 2d 353, 376, 583 N.E.2d 515, 525 (1991). The trial court made reasonable efforts to minimize the references to the circumstances for which defendant had the monitor, and it gave the following agreed limiting instruction to the jury after the evidence was presented:

> "Evidence has been received that Mr. Fitzpatrick was on parole
> October 16, 2017. This evidence has been received on the limited
> issue of the defendant's physical location and the state of mind of
> the evening of October 16, 2017[,] and the morning of October 17,
> 2017[,] and may not be considered by you—be considered by you
> only for those limited purposes, physical location and state of
> mind."

¶ 42    " 'A limiting instruction reduces any prejudice created by admitting other-crimes evidence,' " and this was the instruction to which defendant agreed at trial. *People v. Stevenson*,

2014 IL App (4th) 130313, ¶ 55, 12 N.E.3d 179 (quoting *People v. Young*, 381 Ill. App. 3d 595, 601, 887 N.E.2d 649, 654 (2008)).

¶ 43 From this record, we cannot find the trial court abused its discretion in allowing otherwise relevant evidence to reach the jury on an issue as material as establishing the identity of defendant as the person responsible for the shooting. It was corroborative of other admissible evidence regarding defendant's cell phone, showing him to be at or near the scene of the crime at the time of the shooting. Any prejudice to defendant was outweighed by its probative value and lessened by the court's limiting instruction.

¶ 44                                  C. Defendant's Sentence

¶ 45 Lastly, defendant argues his 65-year sentence was excessive and the trial court failed to consider factors in mitigation.

¶ 46 "The sentence imposed by the trial court is entitled to great deference and will not be reversed on appeal absent an abuse of discretion." (Internal quotation marks omitted.) *People v. Wheeler*, 2019 IL App (4th) 160937, ¶ 39, 126 N.E.3d 787. "A reviewing court must afford great deference to the trial court's judgment regarding sentencing because that court, having observed the defendant and the proceedings, is in a far better position to consider such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, and habits than a reviewing court, which must rely on a 'cold' record." (Internal quotation marks omitted.) *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 41, 2 N.E.3d 333. "When imposing a sentence, the trial court must consider statutory factors in mitigation and aggravation, but the court need not recite and assign a value to each factor it has considered." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38, 92 N.E.3d 494. "The weight to be accorded each factor in aggravation and mitigation in setting a sentence of imprisonment depends on the circumstances

of each case." *People v. Hernandez*, 204 Ill. App. 3d 732, 740, 562 N.E.2d 219, 225 (1990).

Citing *Hernandez* in *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 24, 959 N.E.2d 703, this

court said, "[t]he balance to be struck amongst the aggravating and mitigating factors is a matter

of judicial discretion that should not be disturbed absent an abuse of discretion." "In considering

the propriety of a sentence, the reviewing court must proceed with great caution and must not

substitute its judgment for that of the trial court merely because it would have weighed the

factors differently." *People v. Fern*, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999). "A sentence

within statutory limits will not be deemed excessive and an abuse of the court's discretion unless

it is 'greatly at variance with the spirit and purpose of the law or manifestly disproportionate to

the nature of the offense.' " *People v. Pina*, 2019 IL App (4th) 170614, ¶ 20, 143 N.E.3d 794

(quoting *Fern*, 189 Ill. 2d at 54).

¶ 47        At sentencing, in addition to the evidence the trial court had already heard about

this shooting and the life-threatening injuries caused to the elderly victim, the trial court heard

testimony concerning several incidents of violence and serious criminal behavior in which

defendant had been engaged since 2009. These included:

> (1) an incident in April 2009, where a landlord reported
>
> complaints about non-tenant drug dealers forcing tenants to allow
>
> them to use their apartments to sell drugs. Defendant, who was not
>
> on the lease, was found in an apartment with a clear plastic bag
>
> containing eight individually tied plastic bags found to contain
>
> crack cocaine, a gun, and a box of ammunition, all in the couch
>
> upon which defendant was seen before police entered.
>
> (2) an incident in May 2009, where defendant admitted

spraying a McDonald's manager in the face with pepper spray during an argument in the drive-thru, for which defendant received a three-and-a-half-year DOC sentence for aggravated battery.

(3) the investigation of a shooting at a Decatur nightclub in March 2012, where defendant was identified as the person who shot five people with a .45-caliber handgun. According to witnesses, defendant entered the club firing six to seven rounds and hitting the various victims. Defendant admitted being present but denied the shooting, and when the one victim who positively identified him was threatened and eventually became uncooperative, defendant pleaded to possession of a weapon by a felon for 12 years in DOC.

(4) the execution of arrest and search warrants on defendant's residence in October 2017, where officers found defendant, along with 10 individually packaged baggies of heroin, 5 separate packages of crack cocaine, a bag containing 10 grams of cocaine and a .45-caliber Colt revolver previously stolen from the Mt. Vernon Police Department. Defendant acknowledged ownership of the drugs and firearm.

(5) two physical altercations while defendant was in custody awaiting trial in this case and for which he was placed in disciplinary segregation.

¶ 48    The court was also aware defendant was appearing for his sentencing in shackles

as the result of an incident approximately one week before sentencing where defendant reported to a counselor that "he would be taken out 'by suicide by cop' if he received more than the minimum sentence" and telling the counselor "he would not make it to prison."

¶ 49 Defendant's presentence investigation report revealed, since 2009, six felony convictions for violence, weapons, or drug-related offenses, resulting in at least three separate penitentiary sentences. The report also showed defendant, while on felony probation, had committed other felony offenses, and he was still on parole from a 12-year DOC sentence when he committed the one before us. In addition, as a juvenile, in 2007 defendant was adjudicated a delinquent for aggravated unlawful use of a weapon/vehicle.

¶ 50 The State also presented the victim, Mr. Graham, who read a lengthy victim-impact statement outlining the near-death experience he suffered because of medical complications from being shot three times. Defendant presented no evidence in mitigation, and defendant declined to exercise his right to allocution. The State asked for a life sentence. Defendant suggested a sentence of 35 years.

¶ 51 On appeal, defendant contends his 30-year sentence for attempt (first degree murder) and 35-year sentence as the statutory add-on for personally discharging the firearm that caused great bodily harm to victim did not give proper consideration to two nonstatutory factors in mitigation or defendant's rehabilitative potential. Where the defendant has presented evidence in mitigation, there is a presumption that a sentencing court has considered it. *Halerewicz*, 2013 IL App (4th) 120388, ¶ 43. It is the defendant's burden to show, by referencing explicit evidence in the record, that the trial court failed to do so. *Halerewicz*, 2013 IL App (4th) 120388, ¶ 43. In this case, other than what was contained in the presentence investigation report, defendant presented no evidence in mitigation.

¶ 52　　　　Defendant identifies no place in the record where the trial court explicitly rejected any evidence contained in the presentence investigation report, relying instead upon blanket assertions the court "did not take into account [defendant's] difficult childhood," "failed to consider [defendant's] mental health condition," and "failed to consider and act on [defendant's] potential for rehabilitation." Notably, these were not even highlighted by defense counsel at sentencing. As we noted at the outset of this analysis, a sentencing court "is not obligated to recite and assign value to each factor it relies upon, nor does it need to place greater weight on defendant's rehabilitative potential than on the seriousness of the offense or the need to protect the public." *People v. Mayoral*, 299 Ill. App. 3d 899, 913, 702 N.E.2d 238, 248 (1998). "The seriousness of the offense is one of the most important factors for the court to consider." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 28, 82 N.E.3d 693.

¶ 53　　　　We do not find the sentencing court's ruling was "arbitrary, fanciful, unreasonable, or [one] where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20, 743 N.E.2d 126, 138 (2000).

¶ 54　　　　　　　　　　　　III. CONCLUSION

¶ 55　　　　For all the reasons set forth above, we find the trial court's Rule 431(b) admonishments were appropriate and the trial court did not abuse its discretion either in the admission of evidence or sentencing of defendant. The judgment and sentence of the trial court is affirmed.

¶ 56　　　　Affirmed.