NOTICE

Decision filed 08/02/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 190061-U

NO. 5-19-0061

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 16-CF-428 |
| | ) | |
| SABRINA WHEATLEY, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's imposition of a 15-year sentence of imprisonment is affirmed where the trial court properly considered the evidence presented at sentencing and the defendant has made no showing to the contrary.

¶ 2    Following a jury trial, the defendant, Sabrina Wheatley, was convicted of theft of governmental property valued at over $100,0000 (720 ILCS 5/16-1(a)(1), (b)(6.1) (West 2016)), a Class X felony; official misconduct (720 ILCS 5/33-3(a)(2) (West 2016)), a Class 3 felony; and two counts of filing a fraudulent Illinois income tax return (35 ILCS 5/1301 (West 2016)), both Class 4 felonies. The trial court sentenced the defendant to 15 years in the Illinois Department of Corrections, followed by 3 years of mandatory supervised

1

release. The defendant was also ordered to pay restitution in the amount of $382,850.13. The defendant appeals her sentence. For the following reasons, we affirm.

¶ 3                                        BACKGROUND

¶ 4    On November 17, 2016, the defendant was charged by indictment with one count of theft of governmental property in violation of section 16-1(a)(1) and (b)(6.1) of the Criminal Code of 2012 (Code) (720 ILCS 5/16-1(a)(1), (b)(6.1) (West 2016)), one count of official misconduct in violation of section 33-3(a)(2) of the Code (720 ILCS 5/33-3(a)(2) (West 2016)), and two counts of filing a fraudulent Illinois income tax return in violation of section 1301 of the Illinois Income Tax Act (35 ILCS 5/1301 (West 2016)). On July 17, 2018, the defendant's case proceeded to a jury trial. A summary of the evidence presented at trial is as follows.

¶ 5    The defendant worked as a bookkeeper for Webber Township High School (Webber) in Bluford, Illinois, from 1999 until September 30, 2015. In her capacity as bookkeeper, the defendant was responsible for the accounting of Webber's day-to-day finances, including payroll and bills, and had computer access to Webber's bank account and accounting software. The defendant also prepared "board packets," which included the payroll and bills to be approved by the Webber school board at its meetings.

¶ 6    On February 18, 2013, the defendant submitted her letter of resignation to the Webber Township High School Board. The defendant's letter indicated that the board had previously agreed to pay for her early retirement,[1] and that the defendant wanted to ensure

---

[1]The defendant's last authorized paycheck from Webber was issued in December 2012, and the defendant began receiving Illinois Municipal Retirement Fund (IMRF) pension benefits that same month.

2

that her replacement was comfortable before the defendant "cut the purse strings." The defendant stated that she would be willing to continue working from home until Webber had completed their consolidation into a single school district with Bluford Grade School. Because the school board had already paid for the defendant's early retirement, she requested that they only pay for her monthly health insurance. On February 26, 2013, the school board accepted the defendant's resignation, and the defendant continued working for Webber in the limited capacity outlined in the letter of February 18, 2013.

¶ 7    In July 2015, the consolidation of the Webber and Bluford schools was completed. On September 18, 2015, the school district notified the defendant that the district no longer required her services in exchange for monthly health insurance benefits but offered to keep the defendant enrolled in the insurance program at her own expense. The district also offered to pay the defendant $30 per hour for any future consulting services.

¶ 8    Thereafter, school administrators discovered discrepancies in Webber's general ledger, and it was discovered that some of Webber's funds had been deposited into the defendant's personal bank account. On December 23, 2015, co-superintendents John Ashby and Rod Stover met with the defendant and questioned her regarding her understanding of the terms of her postretirement employment and the unauthorized funds deposited into her bank account. The defendant indicated that she understood that she was to receive health insurance premiums as payment for her work postretirement. The defendant also acknowledged that she continued to pay herself but claimed that Stover had given her permission to do so.

¶ 9    April Moore, an agent with the Illinois Department of Revenue's Criminal Investigations Division, testified that she became involved in the case after the Illinois State Police contacted her agency regarding a theft at Webber. Agent Moore reviewed the school's ledgers, bank statements and associated check images, and direct deposit listings, as well as documents relating to the defendant's personal accounts at Banterra Bank and the Jefferson County Schools Credit Union. Agent Moore determined that the defendant used four methods to appropriate money from Webber over an approximately five-year period. First, the defendant wrote checks drawn on Webber's bank account at Peoples National Bank which were subsequently deposited into the defendant's account at the Jefferson County Schools Credit Union. Agent Moore calculated that there were 65 unauthorized transactions totaling $175,422.58. Second, the defendant transferred money via direct deposit from Webber's account at Peoples National Bank to her personal bank account at Banterra Bank. Agent Moore calculated that there were 67 unauthorized direct deposits into Banterra Bank, totaling $187,687.94. Third, the defendant wrote six duplicate payroll checks to herself drawn on Webber's account at Peoples National Bank totaling $14,496.93. Finally, the defendant, without authorization, added a dependent to her health insurance plan, which resulted in the defendant receiving unauthorized health insurance payments in the amount of $5242.68. In sum, Agent Moore concluded that the defendant received a total of $382,850.13 in unauthorized payments.

¶ 10    Agent Moore also reviewed the defendant's Illinois tax returns for the years 2010 through 2014. The State only questioned Moore regarding 2011 and 2012. The tax returns

4

for these years did not include the additional payments from Webber that the defendant had deposited into her personal bank accounts.

¶ 11 The defendant testified and acknowledged that money was deposited into her bank accounts between 2010 and 2015 that "should not have been there." She denied, however, transferring any unauthorized funds into her bank accounts. The defendant claimed that she did not keep track of the amount of money in her bank accounts and was unaware of how the unauthorized funds were deposited into her accounts. The defendant testified that she continued to pay herself a salary from February 2013 through 2015 because she was never told that she could no longer be paid. When asked whether the amounts she deposited into her accounts during this time were "rightfully earned income," the defendant replied, "It's my salary. It's what I earned what they are talking about this whole five years." The defendant also testified that she believed she was authorized to add her son to her health insurance plan postretirement. The defendant further testified that she worked various other jobs during the time period at issue, which included bartending, serving, and some accounting work on the side. While not all of the defendant's income was reported on her W-2's, the defendant was "confident" that she earned more money than was reflected on her W-2's.

¶ 12 The jury found the defendant guilty of each count alleged in the indictment. The trial court ordered that a presentence investigation report (PSI) be prepared for sentencing. The defendant's bail was revoked, and she was taken into custody. The defendant did not file a motion for new trial.

¶ 13     The PSI provided that prior to her incarceration for these offenses, the defendant was residing in Port St. Lucie, Florida. The PSI also reported that the defendant's elderly mother resided in Port St. Lucie, and the defendant's father was deceased. The defendant reportedly had three siblings and two adult children, all of whom resided in Illinois. The defendant was previously divorced in March 2012.

¶ 14     The defendant's education history revealed that she graduated from high school in 1979. She then attended Rend Lake College from 1979 to 1981, earning an associates degree in criminal justice. The defendant subsequently attended Southern Illinois University's School of Technology from 1983 to 1985 and reportedly studied to be an executive legal secretary, earning an associates degree in that field. The PSI further indicated that the defendant received a certificate for medical coding and billing through an internet program. The defendant's employment history indicated that, in addition to her employment at Webber, the defendant worked as a bartender and server at various establishments while living in Florida.

¶ 15     The PSI went on to relate that the defendant reported that she drank alcohol socially and experimented with marijuana in high school. She denied any history of alcohol or drug abuse and had never sought treatment for any substance abuse. The defendant had no physical or mental impairments and had never sought treatment for any mental health disorders.

¶ 16     The defendant's criminal history revealed that she did not have any history of delinquency as a juvenile. As an adult, she was charged in 1998 with driving under the influence (DUI) and received 12 months of court supervision.

6

¶ 17     On December 6, 2018, the trial court held a sentencing hearing. Because the offense of theft of governmental property was a Class X felony, the defendant faced a sentencing range of 6 to 30 years' imprisonment, followed by 3 years of mandatory supervised release, and was not eligible for probation or a conditional discharge. See 730 ILCS 5/5-4.5-25 (West 2018). Before the parties presented evidence, the trial court indicated that it had reviewed the PSI and considered it, as well as the financial impact of incarceration.

¶ 18     The State then presented its evidence in aggravation.[2] Kim McCormick replaced the defendant as bookkeeper following the consolidation of the Webber and Bluford schools. McCormick testified regarding Webber's financial status. In 2014, Webber lacked programs such as art, music, and band. Over half of the students in the school district received free or reduced lunches. Due to Webber's financial straits, the high school sold bonds in 2014 to "keep them afloat," and McCormick indicated that the defendant had signed the "bond agreement." During this time, Webber also experienced decreased enrollment which, in turn, decreased the State aid Webber received. On March 19, 2015, the school board held a meeting during which Webber laid off four full-time teachers and two support personnel. McCormick described this board meeting as "very emotional." McCormick estimated that the defendant had caused approximately $380,000 in financial damage to the school district. McCormick testified that the school district had received approximately $260,000 from insurance and was waiting on an additional insurance claim

---

[2]At sentencing, the State introduced several exhibits which included Webber's annual financial reports from 2010 through 2015, bond paperwork between Kings Financial Consulting Inc. and Webber, minutes from school board meetings, and 61 copies of checks written to the defendant from 2002 through 2005 which had been found in storage.

to cover the remaining losses. McCormick acknowledged that from 2012 to 2014 "every school district was in trouble" because of State funding.

¶ 19    Paul Manning, a member of the school board, testified that he considered the defendant a friend and believed that he had a good working relationship with her. Nevertheless, Manning believed that the defendant tried to manipulate him on one occasion and was not always honest with him. Manning testified that he voted in favor of issuing bonds and made decisions on the board to lay people off and cut school programs based upon the financial information provided to him by the defendant.

¶ 20    Superintendent John Ashby testified that Bluford, Illinois, and the surrounding area consisted of lower socioeconomic, working class citizens and that poverty existed in the area. When Ashby took over Webber in 2014, the school was struggling financially and working cash bonds for $180,602.36 were issued, of which the school received "172,000 and some." The total principal and interest to be paid for the bonds was $286,300, which was being paid for by the taxpayers. Ashby further testified that in 2010, Webber's education fund had a balance of $596,737. By 2014, the fund's balance was $16,000. Ashby confirmed that the defendant helped with the budget during this time and would have known the school's financial difficulties.

¶ 21    After the State presented its witnesses in aggravation, the defendant presented her evidence in mitigation. Ken Sentel, the defendant's former employer and friend, testified that the defendant performed accounting work for his company. Sentel considered the defendant to be a good employee and stated that he would hire the defendant again after

she is released from prison. Sentel also described the defendant as a dedicated grandmother and a "special lady."

¶ 22    Elijah Sentel, Ken's son, testified that he had known the defendant his entire life. Elijah admitted that he struggled with both alcohol and drugs. Elijah stated that the defendant "got [him] off the street" and provided him with a place to stay after he left a rehab facility. The defendant also helped Elijah return to his family and persuaded him to go to another rehab facility, where he ultimately completed the program. Elijah credited the defendant with saving his life and believed that he would not be clean and sober without the defendant's help.

¶ 23    Larry Gibson, a friend of the defendant, testified that he had known the defendant for approximately 15 years. The defendant had volunteered to serve as a bartender for parties he and his wife held in the summers of 2017 and 2018. Gibson believed that the defendant had a great character and considered her trustworthy.

¶ 24    Salina Hilliard, the defendant's daughter, described the defendant as a "great" grandmother whom Hilliard relied upon significantly to help care for her children. Hilliard further testified that the defendant was an integral part of her grandchildren's lives and that her incarceration was having a negative impact on the grandchildren.

¶ 25    Shlonda Horton, the defendant's sister, testified that the defendant's mother lived with the defendant in Florida, and that the defendant was her mother's caregiver. The defendant had also cared for their father until he passed away years earlier. Horton testified that the defendant's incarceration adversely affected the entire family. Horton stated that the defendant's sentence was a sentence for the whole family.

¶ 26    Derek Nowicki, the defendant's friend, testified that he had known the defendant for 35 years. Nowicki described the defendant as a giving person who "would do anything for you." Nowicki believed that the defendant was a "very good member of society" and a good person who deserved leniency.

¶ 27    Michelle Ashby, the general manager of a golf club, testified that she knew the defendant for 10 to 12 years, and that the defendant had volunteered her time to help at the golf club. Ashby testified that she "explicitly" trusted the defendant, and that the defendant was like a mother to Ashby's children.

¶ 28    Susie Williams testified that she knew the defendant for more than 30 years and became friends with her when they worked together at an elementary school. Williams stated that the defendant helped Williams through her divorce and when she lost her father to cancer. Williams also testified that she had observed the defendant helping children at the elementary school when "the kids needed taken care of." Williams described the defendant as a good friend and a good person.

¶ 29    Finally, the defendant submitted 39 letters of support. These letters generally spoke highly of the defendant's character and work ethic. The trial court indicated that it had read the letters prior to the sentencing hearing.

¶ 30    The trial court then heard arguments regarding the imposition of the defendant's sentence. The State argued that numerous factors in aggravation applied to the defendant's case. The State contended that the defendant utilized her professional reputation or position in the community to commit her offenses or to afford her an easier means to commit the

offenses. The State further argued that the trial court's sentence would be necessary to deter others from committing the same crime.

¶ 31    The State also argued that several nonstatutory factors in aggravation applied to the defendant's case. The State contended that the defendant lied at trial when she testified regarding her lack of knowledge as to how the unauthorized funds were deposited into her accounts and lied about her income on certain loan documents which had been previously admitted into evidence at trial. The State also asked the trial court to consider the financial condition of the school at the time of the defendant's crimes. The State asserted that the defendant knew of Webber's financial trouble and made the problem worse, rather than "helping to right the ship." Finally, the State argued that the defendant used the stolen money to support expenditures, such as a boat, plastic surgery, golf, country clubs, travel, entertainment, spas, resorts, and dining. The State requested that the trial court sentence the defendant to 15 years' imprisonment and order the defendant to pay restitution.

¶ 32    Defense counsel first argued that the aggravating factor regarding the defendant using her professional reputation or position in the community to commit the offenses or to afford her an easier means to commit the offenses did not apply. Defense counsel also argued that the minimum sentence of six years was a significant sentence that would deter others from committing similar crimes. Defense counsel contended that in similar cases, other defendants received probation.

¶ 33    The defense also argued that several statutory factors in mitigation applied. Defense counsel argued that the defendant's conduct neither caused nor threatened to cause serious physical harm to another; that the defendant did not contemplate her conduct would cause

11

or threaten physical harm to another; that the defendant lacked a criminal history; that the crimes were the result of circumstances unlikely to recur; that the defendant's attitude indicated she was unlikely to commit another crime; and that imprisonment would cause excessive hardship to the defendant's dependents, including the defendant's mother. Defense counsel reminded the trial court of the witnesses who testified on the defendant's behalf at sentencing and the positive effects the defendant had on their lives. Defense counsel further noted that the defendant lost her pension as a result of her conduct and argued that the defendant should be given consideration for this against restitution. Defense counsel concluded by requesting that the trial court sentence the defendant to six years' imprisonment.

¶ 34    The defendant made a statement in allocution in which she expressed regret for the harm caused by her actions. She apologized and asked that the trial court allow her to return to her family as soon as possible.

¶ 35    The trial court indicated that it had considered all of the aggravating and mitigating evidence and the arguments of counsel presented at sentencing, as well as the evidence presented at trial. As factors in aggravation, the trial court found that the defendant used her position in the community to commit her offenses and to afford her an easier means of committing the offenses. The trial court also found that its sentence would be necessary to deter others from committing the same crimes. In mitigation, the trial court found that the defendant's conduct did not cause or threaten to cause serious harm, and that the defendant did not contemplate that her conduct would cause or threaten serious physical harm to

12

another. The trial court also found that the defendant had no prior history of delinquency or criminal activity and was not considering the defendant's prior DUI.

¶ 36 The trial court declined to find that the defendant's criminal conduct was the result of circumstances unlikely to recur because the court had not received evidence regarding this factor. The trial court also declined to find that the defendant's character and attitude indicated that she would be unlikely to commit another crime. The trial court explained that it could not make this finding because the defendant was "convicted of stealing $382,000.00 plus from basically school kids." In addressing whether the defendant's incarceration would cause an excessive hardship on the defendant's dependents, the trial court considered this factor "close." The trial court acknowledged that the defendant cared for her elderly mother but observed that the defendant had three siblings. The trial court also noted that the defendant would go to prison no matter what sentence the court imposed. The trial court stated that under the circumstances, the court would not find this as a factor in mitigation.

¶ 37 Before imposing sentence, the trial court remarked that the evidence of the defendant's guilt at trial was overwhelming, and that the defendant's testimony at trial was disingenuous. The trial court commented that the defendant had been trusted by the community and could not have committed her offenses without that trust. The trial court further commented that the effects of the defendant's offenses will never be known. The trial court stated that the defendant had stolen an "enormous amount of money for any little school district" and referred to the school district as "one of the poorest ones probably in the State of Illinois." The trial court noted that the defendant was taking money from

13

children and struggling taxpayers to "finance whatever you were financing by spending the money." The trial court acknowledged that many people spoke highly of the defendant's character, but that the defendant had "let them down."

¶ 38 The trial court sentenced the defendant to 15 years for theft of governmental property, 5 years for official misconduct, and 3 years for each count of filing a fraudulent Illinois income tax return. The trial court ordered that the sentences were to run concurrently and be followed by three years of mandatory supervised release. The trial court stated that it would have likely imposed a greater sentence had the State not "mentioned" 15 years. The trial court also entered judgments against the defendant in favor of "Bluford Unit School District #318"[3] in the amount of $122,447.29 and in favor of Travelers Casualty and Surety Company in the amount of $260,402.84 for a total amount of $382,850.13.

¶ 39 On December 11, 2018, the defendant filed a motion to reconsider sentence. In her motion, the defendant asserted that the trial court improperly relied on its personal knowledge when it noted that the defendant stole money from one of the poorest school districts in Illinois. The defendant contended that no evidence had been presented at trial or sentencing to establish how the school district compared to other districts in Illinois. The defendant also claimed that her sentence was excessive in light of her personal characteristics, most notably her lack of criminal history. Following a hearing, the trial court denied the defendant's motion. This appeal follows.

---

[3]By the time of sentencing, the Webber school and the Bluford school had consolidated.

¶ 40                                    ANALYSIS

¶ 41    On appeal, the defendant contends that the trial court abused its discretion in sentencing her to 15 years' imprisonment. The defendant requests that this court vacate her sentence and remand this case for a new sentencing hearing or, alternatively, exercise our authority under Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) and reduce her sentence.

¶ 42    At the outset, we note that the defendant's 15-year sentence was within the permissible statutory range for a Class X offense. See 730 ILCS 5/5-4.5-25 (West 2018). When the defendant's sentence is within the statutory limits, a rebuttable presumption exists that the sentence is appropriate. *People v. Gooch*, 2014 IL App (5th) 120161, ¶ 8.

¶ 43    It is well settled that the trial court has broad discretion in fashioning a sentence, and the trial court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The trial court is given such deference because the trial court, having observed the defendant and the proceedings, is in a superior position to consider the appropriate factors at sentencing. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). Accordingly, we review the sentencing court's decision for an abuse of discretion, and a reviewing court must not substitute its judgment for that of the trial court merely because the reviewing court would have weighed the factors differently. *Stacey*, 193 Ill. 2d at 209.

¶ 44    Although the trial court is vested with broad discretion in sentencing, the court's discretion is not without limitation, and reviewing courts have the power to reduce a defendant's sentence pursuant to Rule 615(b)(4). *Stacey*, 193 Ill. 2d at 209. When a sentence falls within the statutory limits for an offense, however, it will not be deemed

excessive and the result of an abuse of discretion by the trial court unless the sentence imposed is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *Stacey*, 193 Ill. 2d at 210.

¶ 45    The Unified Code of Corrections permits the trial court to consider certain statutory factors in aggravation and mitigation when arriving at a sentence. See 730 ILCS 5/5-5-3.1 (mitigating factors), 5-5-3.2 (aggravating factors) (West 2018). In fashioning an appropriate sentence, the trial court must carefully consider all aggravating and mitigating factors including, *inter alia*, the defendant's age, demeanor, habits, credibility, criminal history, social environment, and education, as well as the nature and circumstances of the crime and the defendant's conduct in the commission of the crime. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). When such factors have been presented for the trial court's consideration, we presume, absent some indication to the contrary, that the trial court considered the factors. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). The trial court is not required to enumerate and assign value to each factor it considered in fashioning the defendant's sentence. *People v. Mayoral*, 299 Ill. App. 3d 899, 913 (1998). Additionally, the trial court is not required to impose a minimum term or reduce a term from the maximum because of the existence of mitigating factors. *People v. Madura*, 257 Ill. App. 3d 735, 741 (1994).

¶ 46    The defendant contends that the trial court did not adequately consider the defendant's character and reputation in the community; the effect of the defendant's incarceration on her elderly mother; and the defendant's age. The record belies the defendant's contention.

16

¶ 47 At sentencing, the trial court indicated that it had considered the evidence presented at trial, the aggravating and mitigating evidence, and the arguments presented at sentencing. The evidence at sentencing included the testimony of several defense witnesses and 39 letters regarding the defendant's character and work ethic. The trial court also indicated that it had reviewed and considered the PSI. The record reveals that the defendant was 57 years old at the time of sentencing. As to the effect of the defendant's incarceration on her mother, the trial court admitted that this factor was "close" and found it admirable that the defendant had been caring for her mother. The trial court observed, however, that the defendant had three siblings and was going to receive a prison sentence regardless of the sentence imposed by the trial court. Under these circumstances, the trial court declined to consider this factor in mitigation.

¶ 48 The defendant also contends that the trial court overstated the harm to the taxpayers, the school district, and the government. The defendant argues that the trial court did not consider the fact that the school district had been partially reimbursed by insurance and that the school district anticipated future reimbursement to cover the remainder of the school district's loss; that the school district saved money because the defendant continued to work full-time as a bookkeeper postretirement; and that the defendant's IMRF pension had been terminated as a result of her conduct.

¶ 49 The defendant's contentions here are meritless. The trial court was presented with evidence that the school district had been partially reimbursed from insurance at the time

of sentencing and expected future reimbursement.[4] Based on the record, the trial court was also well aware of the fact that the defendant continued to work full-time postretirement. The defendant's argument that the school district received a benefit because it expected to be fully reimbursed by insurance monies, and that the defendant's postretirement work allegedly saved the school district money, reflects a lack of remorse for taking the money from the school district. The evidence showed that the defendant, in her position as bookkeeper, continuously took money over a five-year period from Webber, which was struggling financially. This five-year period included the defendant's postretirement work where she received monthly health insurance premiums because the school board had paid for her early retirement. We are not persuaded that the defendant somehow saved the school district money while she also engaged in the ongoing theft scheme for which she was charged. Finally, the record shows that the trial court was made aware of the fact that the defendant's IMRF pension had been terminated as defense counsel mentioned this point at sentencing.

¶ 50    Upon a review of the record, it is clear that the trial court considered the evidence in aggravation and mitigation before imposing its sentence on the defendant. When mitigation evidence is before the trial court, we presume the court considered the evidence, absent some indication, other than the length of the sentence imposed, to the contrary.

---

[4]The defendant suggests that had she stolen money from the insurance company rather than Webber, she would have been charged with a "probationable Class 1 felony" rather than a Class X offense. To the extent the defendant believes this should have some bearing on her sentence, her contention is not persuasive. The defendant did not take money from an insurance company, but instead stole from a high school. The legislature has designated such a theft as a Class X offense. See 720 ILCS 5/16-1(a)(1), (b)(6.1) (West 2016).

*Madura*, 257 Ill. App. 3d at 740. The defendant has made no showing that the trial court failed to consider any of the evidence presented at sentencing, and the trial court did not overstate any of the factors relative to the harm suffered by the school district. Thus, the trial court did not abuse its discretion, and the defendant's sentence is not excessive in light of the evidence presented.

¶ 51　For the foregoing reasons, we affirm the defendant's sentence.


¶ 52　Affirmed.